UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

_____

| | |
|---|---|
| EQUAL EMPLOYMENT ) | |
| OPPORTUNITY COMMISSION, ) | |
| 10 S. Howard Street, 3rd Floor ) | |
| Baltimore, MD 21201 ) | |
| ) | Civil Action No. |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ) | COMPLAINT |
| PERFORMANCE FOOD GROUP, INC., f/k/a ) | |
| VISTAR CORPORATION; PFG HOLDINGS, LLC; ) | |
| PERFORMANCE FOOD GROUP COMPANY; ) | |
| PERFORMANCE FOOD GROUP COMPANY, LLC; ) | |
| PFG BROADLINE HOLDINGS, LLC; PFG ) | JURY TRIAL DEMAND |
| BROADLINE HOLDINGS, INC.; PFG SUPPORT, ) | |
| LLC; d/b/a ) | |
| PERFORMANCE FOODSERVICE; ) | |
| PERFORMANCE FOOD GROUP; ) | |
| PERFORMANCE FOODSERVICE –AFI ) | |
| f/k/a AFI FOODSERVICE, LLC; ) | |
| PERFORMANCE FOODSERVICE –BATESVILLE ) | |
| f/k/a PFG BROADLINE HOLDINGS; ) | |
| PERFORMANCE FOODSERVICE –CARO ) | |
| f/k/a CARO FOODS, LLC; ) | |
| PERFORMANCE FOODSERVICE –CARROLL ) | |
| COUNTY ) | |
| f/k/a CARROLL COUNTY FOODS, LLC; ) | |
| PERFORMANCE FOODSERVICE –FLORIDA ) | |
| f/k/a PFG FLORIDA, LLC; ) | |
| PERFORMANCE FOODSERVICE –HALE ) | |
| f/k/a HALE BROTHERS SUMMIT, LLC; ) | |
| PERFORMANCE FOODSERVICE –LESTER ) | |
| f/k/a KENNETH O. LESTER COMPANY, INC; ) | |
| PFG-LESTER BROADLINE, LLC; ) | |
| PFG-LESTER BROADLINE, INC; ) | |
| PERFORMANCE FOODSERVICE –LITTLE ROCK ) | |
| f/k/a PFG BROADLINE HOLDINGS, INC.; ) | |
| PFG-MAGEE ) | |
| PERFORMANCE FOODSERVICE –MIDDENDORF ) | |

```
        f/k/a MIDDENDORF MEAT COMPANY, LLC;)
      MIDDENDORF QUALITY FOODS, INC.      )
PERFORMANCE FOODSERVICE –MILTONS          )
        f/k/a PFG MILTONS, INC.           )
PERFORMANCE FOODSERVICE –                 )
NORTHCENTER                               )
        f/k/a NORTHCENTER FOODSERVICE, LLC; )
PERFORMANCE FOODSERVICE –POWELL           )
        f/k/a PERFORMANCE FOOD GROUP OF    )
        GEORGIA, LLC;                      )
PERFORMANCE FOODSERVICE – SOUTH           )
FLORIDA                                   )
        f/k/a EMPIRE IMPORTS, LLC; EMPIRE  )
        SEAFOOD HOLDING CORP; EMPIRE       )
        SEAFOOD, LLC;                      )
PERFORMANCE FOODSERVICE –SPRINGFIELD      )
        f/k/a SPRINGFIELD FOODSERVICE, LLC; )
PERFORMANCE FOODSERVICE –TEMPLE           )
        f/k/a PERFORMANCE FOOD GROUP OF    )
        TEXAS, LLC; PFG OF TEXAS, LLC      )
PERFORMANCE FOODSERVICE –THOMS            )
PROESTLER                                 )
        f/k/a THOMS PROESTLER COMPANY, LLC; )
PERFORMANCE FOODSERVICE –VICTORIA         )
        f/k/a PERFORMANCE FOOD GROUP OF    )
        TEXAS, LLC                         )
PERFORMANCE FOODSERVICE –VIRGINIA         )
        f/k/a VIRGINIA FOODSERVICE GROUP,  )
        LLC.                               )
1333 Avondale Rd.                         )
New Windsor, MD 21776                     )
                                          )
              Defendant.                  )
_____)
```

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of sex, and to provide appropriate relief to Julie Lawrence and to a class of female applicants who were adversely affected by such practices. As alleged with greater particularity below, the Equal Employment Opportunity Commission ("Commission") alleges that Defendant, Performance Food Group,

2

Inc., its successors, predecessors, affiliates, and/or subsidiaries ("Defendant"), through its Broadline operating division (a/k/a "Performance Foodservice"), since at least January 1, 2004, has engaged in, and continues to engage in, unlawful discrimination by maintaining a standard operating procedure of denying employment to female applicants for operative positions in its Broadline facilities on the basis of their gender.  The Commission further alleges that in or around February 2007, Defendant failed to promote Julie Lawrence into the position of Nighttime Warehouse Training Supervisor at its Carroll County, Maryland facility on the basis of her gender.  Defendant's hiring and promotion practices have been undertaken with the purpose and have had the effect of denying females employment because of their sex in violation of Title VII.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) and 707(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§§ 2000e-5(f)(1) and (3) and 2000e-6 ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were committed in numerous locations across the United States, including within the jurisdiction of the United States District Court for the District of Maryland, Baltimore Division.  Venue is proper in this Court.

## PARTIES

3.      Plaintiff, Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation, and

enforcement of Title VII, and is expressly authorized to bring this action by Sections 706(f)(1) and (3) and 707 of Title VII, 42 U.S.C. §§2000e - 5(f)(1) and (3) and 2000e-6.

4.      Defendant, Performance Food Group, Inc. ("PFG"), a Colorado Corporation with its principle place of business located at 12500 West Creek Parkway, Richmond, VA 23238, is registered to do business in the State of Maryland.

5.      Defendant PFG distributes food-related products to more than 130,000 independent and national chain restaurants, theaters, schools, hotels, health care facilities, and other institutions across the United States through its four business divisions, "Performance Foodservice" (f/k/a "Broadline"), "ROMA food," "Vistar," and "Customized."

6.      Defendant PFG, its successors, predecessors, affiliates, and/or subsidiaries through its "Performance Foodservice" and/or "Broadline" division(s), is now and at all relevant times has been engaged in the business of marketing and distributing branded food and non-food products to various customers in the food service industry nationwide, from its distribution centers located in, but not limited to: New Jersey; Mississippi; Louisiana; Maryland; Florida; Tennessee; Arkansas; Missouri; Georgia; Maine; Massachusetts; Texas; Illinois; and Virginia.

7.      Prior to May, 2008, PFG's predecessor in interest, "Performance Food Group Company," a Tennessee corporation, was divided into two divisions – Broadline and Customized.

8.      "Performance Food Group Company," a Tennessee corporation, through its wholly-owned subsidiaries, operated approximately 20 Broadline distribution centers, also known as operating companies ("OpCos") across the United States, and employed roughly 7,000 employees. The Broadline division distributed a broad array of national and proprietary brand food and related products to its customers.  The Broadline division designed its own product

mix, distribution routes and delivery schedules for its customers located within a 250 mile radius of its distribution centers.

9. "Performance Food Group Company," a Tennessee corporation, maintained personnel and payroll information for each of its employees working at its "OpCos" through an electronic database referred to as "Lawson."

10. "Performance Food Group Company," a Tennessee corporation, maintained corporate management and control over each "OpCo," including but not limited to centralized direction in the areas of strategic planning, category management, operations management, sales management, general and financial management, human resources and information systems strategy and development. Additionally, financial information reported by the OpCos were reviewed and consolidated by corporate management.

11. On or about May 23, 2008, "Performance Food Group Company," a Tennessee corporation was taken private and was merged with a wholly-owned subsidiary of VISTAR Corporation, Panda Acquisition, Inc. Panda Acquisition, Inc. was formed solely for the purpose of effectuating the merger and had not engaged in any business except in furtherance of this purpose.

12. On or about May 23, 2008, "Performance Food Group Company," a Tennessee corporation, was converted to "Performance Food Group Company, LLC," a Delaware limited liability company.

13. "Performance Food Group Company, LLC" was the surviving entity of the merger and became a wholly-owned subsidiary of VISTAR Corporation.

14. On or about May 23, 2008, "PFG Broadline Holdings, Inc.," an Arkansas corporation, was converted to an Arkansas limited liability company, "PFG Broadline Holdings,

LLC," and was merged into "PFG Broadline Holdings, LLC," a Delaware limited liability company.

15.    "PFG Broadline Holdings, LLC," operated as a wholly-owned subsidiary of "Performance Food Group Company, LLC."

16.    On or about November 9, 2010, VISTAR Corporation changed its name to "Performance Food Group, Inc."

17.    On or about November 10, 2010, "Performance Food Group Company, LLC" changed its name to "PFG Holdings, LLC."

18.    On or about January 27, 2012, "PFG Holdings, LLC" and "PFG Broadline Holdings, LLC" merged into "Performance Food Group, Inc."

19.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located a 1 Ikea Drive, Elizabeth, NJ 07207, through its wholly-owned subsidiary and/or operating entity "AFI Foodservice, LLC." which was doing business as "PFG-AFI." On or about January 27, 2012, "AFI Foodservice, LLC." merged into Defendant PFG and continues to operate as "Performance Foodservice – AFI."

20.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Elizabeth, NJ facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

21.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 506

Highway 35 N, Batesville, MS 38606, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "PFG Broadline Holdings, Inc." and/or "PFG Broadline Holdings, LLC" which was doing business as "PFG-Batesville."   On or about January 27, 2012, "PFG Broadline Holdings, LLC" merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Batesville."

22.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Batesville, MS facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

23.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 2324 Bayou Blue Rd., Houma, LA 70364, through its subsidiary "Caro Foods, LLC," which was doing business as "PFG-Caro Foods."   On or about May 23, 2008, Caro Foods, LLC merged into VISTAR Corporation, which changed its name to Performance Food Group, Inc., on or about November 9, 2010.   The facility continues to operate as "Performance Foodservice – Caro."

24.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Houma, LA facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

25.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 1333 Avondale Rd., New Windsor, MD 21776, through its subsidiary "Carroll County Foods, Inc.," which merged with "Carroll County Foods, LLC" on or about December 27, 2006, which was doing business as "PFG-Carroll County Foods."   On or about January 27, 2012, "Carroll County Foods, LLC" merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Carroll County."

26.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the New Windsor, MD facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

27.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 3150 North Gallagher Rd., Dover, FL 33527, through its subsidiary "PFG of Florida, LLC" which was doing business as "PFG-Florida."   On or about May 23, 2008, "PFG of Florida, LLC" merged into VISTAR Corporation, which changed its name to Performance Food Group, Inc., on or about November 9, 2010.   The facility continues to operate as "Performance Foodservice – Florida."

28.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Dover, FL facility, maintained the same or similar workforce, including at least some of the

supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

29.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 5262 Air Park Blvd., Morristown, TN 37813 through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Hale Brothers Summit, LLC" and/or "Hale Brothers Summit, Inc." and/or which was doing business as "PFG-Hale."   In or about May 2008, "Hale Brothers Summit, LLC," merged with "Performance Food Group Company, LLC," which changed its name to "PFG Holdings, LLC" on or about November 10, 2010, and merged into Defendant "Performance Food Group, Inc." on January 27, 2012.   The facility has operated since 2010 as "Performance Foodservice – Hale."

30.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Morristown, TN facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

31.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 401 Maddox Simpson Pkwy, Lebanon, TN 37090, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Kenneth O. Lester Company, Inc.," and/or "PFG-Lester Broadline, LLC" and/or "PFG Lester Broadline, Inc." which was doing business as "PFG-Lester."   On or about June 25, 2009, "PFG-Lester Broadline, LLC" and "PFG-Lester Broadline, Inc." merged with "PFG Holdings, LLC" and continued to do business as "PFG-Lester."   On or about June 11,

2010, "PFG-Lester" began operating under the name "Performance Foodservice-Lester." On or about January 27, 2012, "PFG Holdings, LLC" merged into Defendant "Performance Food Group, Inc." The facility continues to operate as "Performance Foodservice – Lester."

32.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Lebanon, TN facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

33.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 4901 Asher Ave., Little Rock, AR 72204, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "PFG Broadline Holdings, Inc." and/or "PFG Broadline Holdings, LLC" which was doing business as "PFG-Little Rock."   On or about January 27, 2012, "PFG Broadline Holdings, LLC" and/or "PFG Broadline Holdings, Inc." merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Little Rock."

34.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Little Rock, AR facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

35.     Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 1800 Simpson Highway 49, Magee, MS 3911, through its wholly-owned subsidiary(ies) and/or operating

entity(ies) "PFG Broadline Holdings, Inc." and/or "PFG Broadline Holdings, LLC" which was doing business as "PFG-Magee." Defendant's facility was closed in 2008.

36.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 3737 North Broadway, St. Louis, MO 63147, through its subsidiary "Middendorf Meat Company, LLC," which was doing business as "Middendorf Meat" and/or "PFG-Middendorf." On or about January 27, 2012, "Middendorf Meat Company, LLC" merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Middendorf."

37.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the St. Louis, MO facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

38.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 3501 Old Oakwood Rd., Oakwood, GA 30566, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "PFG Miltons, Inc.," and/or "Performance Food Group of Georgia, Inc.," and/or Performance Food Group of Georgia, LLC" which was doing business as "PFG-Miltons." On or about January 27, 2012, "PFG Miltons, Inc.," and "Performance Food Group of Georgia, LLC," merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Miltons."

39.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the

Oakwood, GA facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

40.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 20 Dalton Road, Augusta, ME 04338, through its subsidiary "Northcenter Foodservice, LLC," which was doing business as "PFG-Northcenter."   On or about January 27, 2012, "Northcenter Foodservice, LLC," merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Northcenter."

41.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Augusta, ME facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

42.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 211 Alton Hall Rd., Cairo, GA 39828, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Performance Food Group of Georgia, LLC," and/or "Performance Food Group of Georgia, Inc." which was doing business as "PFG-Powell."   On or about January 27, 2012, "Performance Food Group of Georgia, LLC," merged into Defendant PFG and the facility continues to operate as "Performance Foodservice –Powell."

43.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the

Cairo, GA facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

44.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 3595 NW 125th St., Miami, FL 33167, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Empire Imports, LLC," and/or "Empire Seafood Holding Corp.," and/or "Empire Seafood, LLC" which was (were) doing business as "PFG-Empire Seafood."   On or about May 23, 2008, "Empire Imports, LLC," "Empire Seafood Holding Corp.," and "Empire Seafood, LLC" merged into VISTAR Corporation, which changed its name to Performance Food Group, Inc., on or about November 9, 2010.   The facility continues to operate as "Performance Foodservice – South Florida."

45.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Miami, FL facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

46.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at One Performance Blvd., Springfield, MA 01104, through its subsidiary "Springfield Foodservice, LLC," which was doing business as "PFG-Springfield." On or about May 23, 2008, Springfield Foodservice, LLC merged into VISTAR Corporation, which changed its name to Performance

Food Group, Inc., on or about November 9, 2010.   The facility continues to operate as "Performance Foodservice – Springfield."

47.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Springfield, MA facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

48.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 4141 Lucius McCelvey Dr., Temple, TX 76504, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Performance Food Group of Texas, LLC," and/or "PFG of Texas, LLC" which was doing business as "PFG-Temple." The facility continues to operate as "Performance Foodservice – Temple."

49.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Temple, TX facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

50.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 8001 TPC Rd., Rock Island, IL 61201, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Thoms Proestler Company, LLC" and/or "Thoms Proestler Company, Inc.," and/or "PFG Holdings, LLC" which was doing business as "PFG-Thoms Proestler Company." On or

about January 27, 2012, "PFG Holdings, LLC" merged into Defendant PFG and the facility continues to operate as "Performance Foodservice – Thoms Proestler."

51.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Rock Island, IL facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

52.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 204 North Brownson, Victoria, TX 77901, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Performance Food Group of Texas, LLC," and/or "PFG of Texas, LLC" which was doing business as "PFG-Victoria." The facility continues to operate as "Performance Foodservice – Victoria."

53.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Victoria, TX facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

54.    At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries, owned and operated a Broadline warehouse facility located at 7422 Ranco Rd., Richmond, VA 23228, through its wholly-owned subsidiary(ies) and/or operating entity(ies) "Virginia FoodService Group, LLC" and/or "Virginia FoodService Group, Inc.,"

which was doing business as "PFG-Virginia Foodservice." The facility continues to operate as "Performance Foodservice – Virginia."

55.     At all relevant times, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries maintained consistent and continuous operational control over the Richmond, VA facility, maintained the same or similar workforce, including at least some of the supervisory personnel, and ensured the continuity of the facility's business function for the benefit of Defendant PFG and/or its predecessors.

56.     At all times relevant, Defendant PFG, through its successors, predecessors, affiliates, and/or subsidiaries identified in Paragraphs ¶¶ 4-55 above, have operated as a single employer - within the meaning of Section 701(b) of Title VII, 42 U.S.C. § 2000e(b) - and in this regard have maintained interrelated operations; common management; centralized control of labor relations and personnel; and common ownership and financial control.

57.     At all relevant times, Defendant, through its successors, predecessors, affiliates, and/or subsidiaries, has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## STATEMENT OF CLAIMS

58.     More than thirty days prior to the institution of this lawsuit, Julie Lawrence, Jason Geib, and Kyle Gardner filed charges with the Commission alleging violations of Title VII of the Civil Rights Act of 1964, as amended.

59.     During the reasonable course of the Commission's investigation, the Commission uncovered information which supported a charge of nationwide sex-based hiring discrimination by Defendant.

16

60.     On August 7, 2008, the Commission notified Defendant that it had expanded the scope of its investigation of the Lawrence, Geib and Gardner charges to include, *inter alia*, potential sex discrimination in hiring at all of Defendant's facilities, in violation of Title VII of the Civil Rights Act of 1964, as amended.

61.     All conditions precedent to the institution of this lawsuit have been fulfilled.

### COUNT ONE:
### DEFENDANT HAS DISCRIMINATED AGAINST FEMALE APPLICANTS BY DENYING THEM EMPLOYMENT AT DEFENDANT'S BROADLINE FACILITIES

62.     Since at least July 1, 2004, Defendant has engaged in unlawful employment practices at its Broadline facilities, in violation of Sections 703(a)(1) and (a)(2) of Title VII, 42 U.S.C. §2000e-2(a)(1) and (a)(2).   The practices include an ongoing pattern or practice of failing to hire a class of female applicants for operative positions at Defendant's Broadline facilities because of their sex (female).

63.     Defendant has organized and continues to organize its Broadline facilities into three Regions: Northeast, Southwest, and Central.

64.     Each of Defendant's Regions has a Regional Vice President, a Regional Vice President of Operations, a Regional Vice President of Human Resources, and a Regional Vice President of Finance, all of whom report to Vice Presidents located in Defendant's corporate headquarters.

65.     Each Broadline facility has local operations managers who report to their respective Regional Vice President and/or Corporate Vice President.

66.     Defendant's Corporate Senior Vice President of Operations oversees the operations of all Broadline facilities in all three Regions.

67.     Since at least January 1, 2004 through December 31, 2008, Corporate Senior Vice President of Operations Dan Pekscamp oversaw Defendant's Broadline operations.

68.     Since at least January 1, 2009, Corporate Senior Vice President of Operations Jeff Williams has overseen Defendant's Broadline operations.

69.     Defendant's Regional Vice Presidents of Operations report to Defendant's Corporate Senior Vice President of Operations.

70.     Defendant's Regional Vice Presidents of Operations are responsible for, among other things, managing the day to day operations for Broadline facilities in their respective regions, including but not limited to general hiring and staffing issues and reviewing applicant flow for operative positions.

71.     Defendant's operative positions include, but are not limited to: selector; receiving clerk; yard jockey, driver; driver trainee; driver check-in; forklift operator; mechanic; dispatcher; fueler; meat cutter; meat packer; router; sanitation specialist; transportation supervisors; and warehouse supervisors.

72.     Defendant's operative positions are intermediate-skilled occupations and include workers who operate machines or factory-related processing equipment.

73.     Defendant's Corporate Senior Vice President of Human Resources and Chief Human Resources Officer oversees human resources functions of all Broadline facilities in all three Regions.

74.     From at least November 2004 through May 2008, Charlotte Perkins was Defendant's Chief Human Resources office.

75.     Since at least May 2008, Jane Manion has served as Defendant's Corporate Senior Vice President of Human Resources and Chief Human Resources Officer.

76.    Defendant's Regional Vice President of Human Resources have reported and continue to report to Defendant's Corporate Senior Vice President of Human Resources.

77.    Defendant's Regional Vice Presidents of Human Resources have been and continue to be responsible for, among other things, the hiring, discipline, promotions, terminations, and compensation practices for the Broadline facilities in their respective Region.

78.    Each Broadline facility has local human resources managers who report to their respective Regional Vice President of Human Resources and/or Corporate Senior Vice President of Human Resources.

79.    Defendant PFG Broadline facilities disseminate employment policies created and implemented by Defendant's corporate headquarters.

80.    Since at least July 1, 2004, Defendant PFG has maintained and continues to maintain a standard operating procedure of discriminating against females in its hiring of operatives at its Broadline facilities.    This standard operating procedure emanates from Defendant's top management, and in particular, from its Corporate and Regional Vice Presidents.

81.    In or around 2006, during an Operational Meeting, Defendant PFG's Corporate Senior Vice President of Operations Dan Pekscamp informed managers that from his observation and experience, women cannot do warehouse work and questioned "why would we waste our time bringing in females?"

82.    In or around November 2006, during a tour of Defendant PFG's Carroll County facility, Defendant's Corporate Senior Vice President of Operations Dan Pekscamp and Northeast Regional Vice President of Operations Dave Russ expressed their displeasure with the

hiring of female warehouse workers, stating how they would slow down the operation and how it would be a good idea to get the females "out of here."

83.     In or around January 2007, Defendant's Corporate Senior Vice President of Operations Dan Pekscamp instructed the Night Warehouse Manager at Defendant's Carroll County facility to discharge a female employee and questioned why they continued to "hire these girls."

84.     Defendant's Corporate Senior Vice President of Operations Dan Pekscamp's comments regarding female employees constituted a directive to managers to favor males and to discriminate against females in hiring.

85.     Defendant's view that females were not cut out for warehouse work was expressed at Defendant's corporate headquarters and permeated throughout Defendant's Broadline facilities.

86.     For example, in or around January 2007, the Vice President of Human Resources at Defendant's Richmond facility openly stated that women could not do warehouse work and that Defendant would not hire them.

87.     In addition, the Vice President of Operations at Defendant's Springfield facility, Paul Green, instructed the Warehouse Manager Bodgan Lucyzk "not to waste his time interviewing or hiring females for warehouse work as they didn't work out."   Green and the Human Resources Director, Pam Burns, at the same facility also told the Warehouse Manager that females in the warehouse "were a distraction" and "couldn't do the job."

88.     In or around 2008, one of Defendant's hiring managers at its Little Rock, Arkansas facility told warehouse worker applicant Kimberly Avery that Defendant "did not feel safe with women working in the warehouse, did not want women working in the warehouse, that

the work was too strenuous, women didn't last, they quit, they had child care issues."    At the time, Avery had approximately seven years of warehouse experience.    Avery heard nothing further from Defendant regarding her application.

89.    After applicant Lillian Akins unsuccessfully applied for a driver position, she was informed by a warehouse selector at Defendant's Temple, Texas facility that she should not bother applying at Defendant since Defendant "would not hire female drivers."    The warehouse selector informed her that Defendant officials had told him that they did not feel females could manage their own freight.

90.    Applicant April Campbell applied for a warehouse selector position at Defendant PFG's Lebanon, Tennessee facility, but heard nothing further.    A male neighbor of Campbell's who worked for PFG as a forklift operator in the warehouse told her that Defendant "had a real problem with women working there."

91.    When former Transportation Supervisor at Defendant's Elizabeth, New Jersey facility, Marisol Soto, expressed an interested in being promoted to Warehouse Supervisor, she was told that it would be "useless and non-productive for her to apply" because the job was not for her and she could get "hurt as a girl."

92.    On February 18, 2010, this Court ordered that Defendant produce hiring data for employees and applicants within Defendant's Broadline division over which the Corporate Senior Vice President of Operations Dan Pekscamp and/or Regional Vice President of Operations maintained ultimate control.    *EEOC v. Performance Food Group*, MJG-09-02200, ECF No. 29 (Feb. 18, 2010).

93.    A review and analysis of the applicant and hiring data produced by Defendant revealed a statistically significant shortfall of female operatives.    These shortfalls of females

appeared in the overwhelming majority of individual Broadline facilities for all Regions as well as the pooled results analyzed throughout the relevant time period.

94.    A review and analysis of static workforce data reveals that employment of female operative workers at Defendant has been and continues to be less than that of Defendant's competitors in the relevant labor market.    This review included the time period during which Corporate Senior Vice President of Operations Dan Pekscamp oversaw operations as well as the time period subsequent to his departure from Defendant.

**COUNT TWO:**
**DEFENDANT DISCRIMINATED AGAINST**
**JULIE LAWRENCE AT ITS CARROLL COUNTY FACILITY BY**
**FAILING TO PROMOTE HER TO NIGHTTIME WAREHOUSE**
**TRAINING SUPERVISOR BECAUSE OF HER SEX**

95.    Since at least February 2007, Defendant has engaged in unlawful employment practices, in violation of Sections 703(a)(1) and (a)(2) of Title VII, 42 U.S.C. Section 2000e-2(a)(1) and (a)(2).    The practices include failing to promote Julie Lawrence to Nighttime Warehouse Training Supervisor at its Carroll County, Maryland facility because of her sex (female).

96.    On November 13, 2006, Julie Lawrence ("Lawrence") began working as a selector at Defendant's Carroll County Foods facility.    As a selector, Lawrence was responsible for pulling orders in the warehouse which involved the operation of warehouse machinery, including forklifts.

97.    In or around November 2006, Corporate Vice President of Operations Dan Pekscamp and Regional Vice President of Operations Dave Russ expressed to Warehouse Manager Geib their displeasure with the hiring of female workers, how they would slow down the operations, and how it would be a good idea to get the "females out of here."

98.     In or around late 2006 or early 2007, Corporate Vice President of Operations Dan Pekscamp told the night warehouse manager to fire a female employee and questioned why they continued to "hire these girls."

99.     In February 2007, Defendant advertised internally and externally for a Night Warehouse Training Supervisor position at its Carroll County facility.  According to the job announcements, the incumbent would be responsible for overseeing all shipping functions, including maintaining operating standards, staffing, customer service and ensuring fiscal responsibilities.  The incumbent would also be responsible for training and motivating associates, maintaining a safe and clean warehouse work environment, and to function as a team member in the operations department and organization.  The vacancy announcements set forth the following preferences: (1) college degree preferred but not required; (2) four to five years in a warehouse setting; and (3) minimum of one year of foodservice related experience.

100.    At the time of the job postings, Lawrence had graduated from a four-year college, had worked for PFG for three months, had worked for UPS as a Training Supervisor for a year and a half (responsible for 16 part-time training supervisors), and was previously an Area Sales Manager for May Company for approximately four years.

101.    Lawrence's immediate supervisor Warehouse Manager Geib specifically urged Lawrence to apply for the Training Supervisor position because he believed she possessed the skills to be the next supervisor.

102.    Defendant's promotion policy states that while internal applicants must be in their current position for a minimum of six months, such a requirement may be waived due to business conditions or when a manager requests an exception when they have candidates within the same department or division who are qualified and/or already trained for the position.  The

same policy also states that it is the "Company's philosophy … to promote from within the Company, when possible."

103.    On February 28, 2007, Lawrence applied for the Night Training Supervisor position and any upcoming supervisory opportunities by directing a cover letter and resume to Geib for consideration.

104.    Geib fully supported Lawrence's candidacy and presented Lawrence's resume to Regional Vice President of Operations Dave Russ who indicated that Corporate Vice President of Operations Dan Pekscamp would never go for it because he was annoyed with the number of women working at the warehouse and he did not want a woman in a supervisory position.

105.    Geib presented Lawrence's resume to Corporate Vice President of Operations Pekscamp for consideration, but Pekscamp refused to look at the resume, stating "I am not interested in seeing anything from a woman."

106.    Defendant never interviewed Lawrence for the position and continued to solicit external applications for the position.

107.    Defendant interviewed a number of external candidates who lacked the preferred "four to five years in a warehouse setting" and/or "minimum of one year food services []" experience purportedly sought for the position.

108.    On March 15, 2007, Defendant hired a male candidate, Lester Quinteros, as the Night Training Supervisor.  Quinteros lacked the four to five years experience in a warehouse setting and a college degree, and had limited supervisory experience.

109.    When Lawrence asked Night Warehouse Manager Kyle Gardner why she was not considered for the position, Gardner told her that he had heard from upper level management that "no one is interested in a woman [for the position]."

110.    The effect of the practices complained of above in paragraphs 58-109 have been to deprive Julie Lawrence and a class of female job applicants of equal employment opportunities and otherwise affect their status as applicants because of their sex.

111.    The unlawful employment practices complained of above in paragraphs 58-109 are part of a continuing course of sex discrimination perpetrated against female job applicants by Defendant that has persisted since at least July 1, 2004.

112.    The unlawful employment practices complained of above in paragraphs 58-109 above were and are intentional.

113.    The unlawful employment practices complained of above above in paragraphs 58-109 were and are done with malice or with reckless indifference to the federally protected rights of Julie Lawrence and a class of female job applicants.

PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with them, from denying employment to female applicants because of their sex;

B.    Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with them, from denying promotions to female employees because of their sex;

C.    Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for females, and which eradicate the effects of their past and present unlawful employment practices;

D.      Order Defendant to make whole Julie Lawrence and a class of aggrieved female applicants (and deterred applicants) by providing appropriate back pay with prejudgment interest and front pay in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to, rightful place employment;

E.      Order Defendant to make whole Julie Lawrence and a class of aggrieved female applicants (and deterred applicants) by providing compensation for pecuniary and nonpecuniary losses, including emotional pain, suffering, anxiety, depression, embarrassment, degradation, and humiliation;

F.      Order Defendant to pay Julie Lawrence and a class of aggrieved female applicants (and deterred applicants) punitive damages for the malicious and reckless conduct described above, in amounts to be determined at trial;

G.      Grant such further relief as the Court deems necessary and proper in the public interest; and

H.      Award the Commission its costs in this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by the Complaint.

Respectfully submitted,

P. DAVID LOPEZ
General Counsel

JAMES L. LEE
Deputy General Counsel

GWENDOLYN YOUNG REAMS
Associate General Counsel

26

DEBRA M. LAWRENCE
Regional Attorney
Bar No. 04312

/s/
MARIA SALACUSE
Supervisory Trial Attorney
Bar No. 15562

/s/
LINDSEY WHITE
Trial Attorney
Bar No. 29183

TANYA GOLDMAN
Trial Attorney

/s/
JAMES CERWINSKI
Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
10 S. Howard Street, 3rd Floor
Baltimore, Maryland  21201
(410) 209-2733