# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td rowspan="2">Civil No.: CCB-13-1712</td></tr>
<tr><td>v.</td><td>*</td></tr>
<tr><td>PERFORMANCE FOOD GROUP, INC.,</td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

This case was originally referred to me for all discovery and related scheduling matters in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 of the United States Court for the District of Maryland. (ECF No. 57). This case was subsequently re-referred to me for all discovery and related scheduling matters, including the resolution of the motions at hand. (ECF No. 209). Currently pending are: plaintiff's Motion for Sanctions for the Spoliation of Paper Applicant Files ("Paper Spoliation Motion") (ECF Nos. 203, 204), plaintiff's Motion for Sanctions for the Spoliation of ESI ("ESI Spoliation Motion") (ECF Nos. 205, 206), defendant's Opposition to Plaintiff's Motion for the Spoliation of Paper Applicant Files and Motion for Sanctions for the Spoliation of ESI ("Opposition") (ECF Nos. 218, 219), and plaintiff's Reply Memorandum in Support of Plaintiff's Motions for Sanctions for the Spoliation of Paper Applicant Files and ESI ("Reply") (ECF No. 221). No hearing is deemed necessary. Loc. R. 105.6. For the reasons noted below, plaintiff's motions are DENIED.

## I. Factual Background

In 2013, plaintiff Equal Employment Opportunity Commission ("EEOC") filed this employment action against defendant Performance Food Group, Inc. and its successors, predecessors, affiliates, and subsidiaries (collectively "PFG" or "defendant"), alleging unlawful sex-based discrimination in violation of Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991. (ECF No. 5 at 2). Defendant is "engaged in the business of marketing and distributing branded food and non-food products to various customers in the food service industry nationwide." (ECF No. 5 at 3). Prior to May of 2008, defendant was comprised of two divisions, Broadline and Customized. (ECF No. 5 at 4). Defendant operated approximately twenty distribution centers, called operating companies ("OpCos"), in the Broadline division. Id. Operative positions at these OpCos are "intermediate-skilled occupations and include workers who operate machines or factory-related processing equipment," and include, but are not limited to: "selector; receiving clerk; yard jockey, driver; driver trainee; driver check-in; forklift operator; mechanic; dispatcher; fueler; meat cutter; meat packer; router; sanitation specialist; transportation supervisors; and warehouse supervisors." (ECF No. 5 at 18).

In the summer of 2007, plaintiff served defendant with three charges alleging discrimination based on sex filed by employees at defendant's Carroll County Foods ("CCF") OpCo.[1] (ECF No. 203 at 11). Each charge included a preservation notice referencing the Title VII recordkeeping regulation, 29 C.F.R. § 1602.14, which requires retention of "all personnel records relevant to the charge or the action until final disposition of the charge or action."[2] (ECF

---

[1] One employee, Julie Lawrence, alleged that she was rejected for a promotion in favor of a male and that upper management had stated that "no one is interested in a woman." (ECF No. 203 at 11). Two other employees alleged that they were "informed by members of [defendant]'s corporate management of its displeasure with the hiring of some females to work in the warehouse." Id.

[2] 29 C.F.R. § 1602.14 further states that "[t]he term personnel records relevant to the charge, for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an

No. 203 at 11–12). On November 14, 2007, plaintiff requested, among other information, demographic information for all CCF warehouse employees and the status and contact information of two members of corporate management, Broadline Division's Corporate Vice-President of Operations Dan Peckskamp and Regional Vice-President of Operations David Russ. Id. On August 7, 2008, plaintiff notified defendant by letter that "its investigation included 'potential sex discrimination in hiring, discharge, promotion, and compensation at all of [defendant]'s facilities' from 2004 to the present." (ECF No. 203 at 12 (quoting ECF No. 203-8)). Along with this letter, plaintiff filed a Computerized Data Information Request.[3] (ECF No. 203 at 12).

On August 11, 2008, plaintiff notified defendant that it was investigating defendant's compliance with the Equal Pay Act and requested a visit to inspect and copy, among other documents, "individual employee and/or job applicant data (job applications, test scores, job and wage histories, performance appraisals, etc." (ECF Nos. 203 at 12, 203-9). Plaintiff issued administrative subpoenas for this information in October of 2008 and February of 2009, (ECF Nos. 203-10, 203-11), and this court enforced the subpoenas "to the extent [they] seek[] hiring data for employees and applicants under Peckskamp's or Russ's ultimate control." Memorandum and Order re: Subpoena Enforcement, EEOC v. Performance Food Group Co., LLC, No. MJG-09-2200 (D. Md. February 28, 2010), ECF No. 29 at 20. In September of 2012, plaintiff issued a letter finding "that there is reasonable cause to believe that since at least July 1, 2004, [defendant] has, within its Broadline Division, subjected a class of female applicants and employees to a

_____

unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected."

[3] Specifically, plaintiff requested all files maintained "since January 1, 2004 to the present which contain electronic data on personnel activities regarding hiring, discharge, promotion and compensation for all positions, at all of [defendant]'s facilities, including subsidiary organizations," including, but not limited to, "information such as the name, sex, last known address, social security number, date of application and/or promotion, date of hire, position and job title at hire, reason for non-selection, applicant reports on gender, amounts of pay and salary history, test results, training, terminations/resignations, job status, etc." (ECF No. 203-9).

3

company-wide pattern of denied hire and promotion." (ECF No. 205-25 at 2). In June of 2013, plaintiff filed the instant suit, alleging that, "[s]ince at least July 1, 2004, [defendant] has maintained and continues to maintain a standard operating procedure of discriminating against females in its hiring of operatives at its Broadline facilities. This standard operating procedure emanates from [d]efendant's top management, and in particular, from its Corporate and Regional Vice Presidents." (ECF No. 5 at 19). Plaintiff also alleged that defendant discriminated against Julie Lawrence by failing to promote her to Nighttime Warehouse Training Supervisor at its CCF OpCo. (ECF No. 5 at 22).

On March 12, 2014, this Court bifurcated the case into two phases. (ECF No. 37). The Court ordered that Phase One would consist of a determination of the extent to which, if at all, plaintiff could establish its pattern or practice claim. (ECF No. 37 at 12). If plaintiff prevailed in Phase One, the case would proceed to Phase Two to resolve any individual claims. (ECF No. 37 at 13). As to plaintiff's second claim that defendant failed to promote Julie Lawrence, the parties agreed that all issues pertaining to that claim would be tried without bifurcation. (ECF No. 37 at 14). The court ordered that discovery regarding the second claim and Phase One of the first claim would proceed simultaneously. Id. The parties have spent the last few years engaged in discovery. Currently pending are plaintiff's Paper Spoliation Motion (ECF No. 203) and ESI Spoliation Motion (ECF No. 205). Each motion will be addressed separately.

## II.    Spoliation of Paper Applications

### A.  Legal Standard

Federal courts have two sources of authority for the imposition of sanctions due to spoliation of non-electronically stored information. First, a court may issue sanctions under Federal Rule of Civil Procedure 37 when a party commits spoliation in violation of a specific

court order.  <u>Goodman v. Praxair Servs., Inc.</u>, 632 F. Supp. 2d 494, 505–06 (D. Md. 2009).  A court may also impose sanctions for spoliation based upon its inherent authority to control the judicial process.  <u>Id.</u>  Here, plaintiff has not identified any court order violated by defendant in its alleged spoliation; "accordingly, the [c]ourt's ability to impose any sanction must derive from its inherent authority to regulate the litigation process, rather than from any sanction prescribed by the Federal Rules of Civil Procedure."  <u>Id.</u> at 506.

In addressing issues regarding spoliation, the term "spoliation" means "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  <u>Silvestri v. Gen. Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001) (citing <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999)).  A party seeking sanctions based on the spoliation of evidence must establish three elements:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

<u>Goodman</u>, 632 F. Supp.2d at 509 (quoting <u>Thompson v. U.S. Dep't of Hous. & Urban Dev.</u>, 219 F.R.D. 93, 101 (D. Md. 2003)).

If a court finds the above elements to be met, then it may impose sanctions that must serve "the purpose of leveling the evidentiary playing field and . . .  the purpose of sanctioning the improper conduct."  <u>Vodusek v. Bayliner Marine Corp.</u>, 71 F.3d 148, 156 (4th Cir. 1995).  Courts have broad discretion to impose sanctions for spoliation of relevant evidence and the available sanctions "rang[e] from dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs."  <u>Goodman</u>, 632 F. Supp. 2d at

506 (citing <u>In re NTL, Inc. Sec. Litig.</u>, 244 F.R.D. 179, 191 (S.D.N.Y. 2007)). For the following reasons, I conclude that the spoliation at issue here does not warrant the imposition of the sanctions sought by plaintiff.

### B. Discussion

#### i. Breach of the Obligation to Preserve Relevant Evidence

In determining whether to impose sanctions for spoliation, the first element is whether "the party having control over the evidence had an obligation to preserve it when it was destroyed or altered." <u>Thompson</u>, 219 F.R.D. at 101. "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." <u>Id.</u> (quoting <u>Silvestri</u>, 271 F.3d at 591). The duty to preserve relevant evidence is an independent duty that exists even if the party seeking the evidence did not request a court order for its preservation. <u>Thompson</u>, 219 F.R.D. at 100. In order to fulfill the duty to preserve relevant evidence, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." <u>Id.</u> (quoting <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("<u>Zubulake IV</u>")).

Plaintiff alleges that defendant has failed to preserve an estimated 23,769 paper application files from the period of January 1, 2004, to June 30, 2009. (ECF No. 203 at 7). Plaintiff further alleges that defendant primarily failed to preserve the files of applicants who were not hired, and that this failure to preserve was especially stark for female applicants who were not hired. <u>Id.</u> Plaintiff argues that defendant was on notice to preserve all Broadline OpCo applications in August of 2007, once it received three charges by employees alleging discrimination on the basis of sex, as these charges placed defendant on notice of a potential pattern or practice claim. (ECF No. 203

at 13).  Plaintiff also argues that defendant was placed on further notice on November 14, 2007, when plaintiff demanded workplace-wide demographic information and asked to interview Vice-Presidents Peckskamp and Russ.  (ECF No. 203 at 14).

Plaintiff argues that, under defendant's retention policies,[4] as of August of 2007, defendant should have possessed "non-hired" applicant documents for 2005–2007 and hired applicant documents for 2004–2007.  (ECF No. 203 at 15).  Plaintiff further argues that defendant should have possessed all applications for 2004–2007 for its CCF OpCo, as in 2004, defendant was in litigation with plaintiff in a different case where a consent decree required defendant to retain job applications until at least June of 2007.  Id. (citing Consent Decree at ¶¶ 2, 10(c), EEOC v. Carroll County Foods, Civ. No. MJG-03-1698 (D. Md. June 3, 2004), ECF No. 32).

Defendant argues that it was not placed on notice of a company-wide pattern or practice claim until August 7, 2008, when plaintiff issued a letter informing defendant of its expanded investigation.  (ECF No. 218 at 68).  Defendant argues that the three employee charges filed in 2007 only required defendant to preserve CCF OpCo applications.  Id.  Similarly, defendant argues that plaintiff's request for information in November of 2007 was limited to CCF employees and two corporate employees, such that defendant "could not have reasonably anticipated in November 2007" that plaintiff would "file a complaint alleging systemic companywide sex discrimination at all of its warehouses with respect to selectors and drivers."  (ECF No. 218 at 54–55).

Defendant does not dispute that its duty to preserve CCF OpCo applications began in the summer of 2007 when it received individual employee charges.[5]  Id.  These charges, however, did

---

[4] Defendant's recommended retention policy was to retain documents for "non-hired" applicants for two years, for three years beyond termination for hired applicants, and for legal investigations, through final disposition plus the expiration of the applicable statute of limitations.  (ECF No. 203 at 13 (citing ECF Nos. 203-12, 203-13)).
[5] The three charges were filed on June 11, 2007 (ECF No. 203-1), July 16, 2007 (ECF No. 203-2), and July 15, 2007 (ECF No. 203-3).

"not indicate whether the offending conduct was localized or part of a company-wide policy, thus it is insufficient notice of a pattern-or-practice claim." EEOC v. L.A. Weight Loss, 509 F. Supp. 2d 572, 539 (D. Md. 2007). Further, plaintiff's November 14, 2007 letter failed to place defendant on notice of a pattern-or-practice claim, as it specifically requested information about employees from only the CCF OpCo. See id. at 540 (finding that defendant was placed on notice of a company-wide pattern or practice claim when plaintiff provided a request for additional documentation of all vacancies). Accordingly, defendant's duty to preserve all OpCo applications did not begin until August 7, 2008, when plaintiff informed defendant that it was expanding the scope of the investigation.

While plaintiff argues that defendant should be charged with failing to preserve applications in accordance with its document retention policy (ECF No. 203 at 15), defendant's document retention policy does not have the force of law.[6] Rather, defendant was only required by law to retain applications for one year after an applicant was not selected or an employee was terminated. See 24 C.F.R. § 1602.14 ("Any personnel or employment record made or kept by an employer (including but not necessarily limited to . . . application forms submitted by applicants . . .) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination.") Accordingly, by law, defendant

---

[6] Similarly, while plaintiff argues that defendant was required to retain all CCF OpCo applications for three years under a consent decree in a different case, this consent decree only required defendant to "take adequate measures" to achieve the goal of "the implementation of defined and consistent job application, record-keeping, and records retention procedures, including the development and retention of applicant flow data." Consent Decree at ¶¶ 2, 10(c), EEOC v. Carroll County Foods, Civ. No. MJG-03-1698 (D. Md. June 3, 2004), ECF No. 32.

was only required to keep applications dating from June 11, 2006[7] for CCF OpCos and from August 7, 2007[8] for all other OpCos.

Plaintiff alleges that defendant spoliated approximately 23,769 paper application files from all OpCos during the period of January 1, 2004, to June 30, 2009. (ECF No. 203 at 7). Defendant "acknowledges that it did not preserve all of the application data that it had a duty to preserve," but argues that "almost half of the alleged missing applications are for male and female applicants who applied during calendar years 2004 and 2005, the period of time before PFG's preservation duty was triggered," and that defendant produced application data for "81% of applicants who applied between 2006 through mid-2009." (ECF No. 218 at 68). Because defendant was only required to keep applications dating from June 11, 2006 for CCF OpCos and from August 7, 2007 for all other OpCos, defendant was not responsible for preserving all 23,769 paper application files identified by plaintiff. Rather, plaintiff reports that, for all OpCos, defendant failed to produce 4,668 applications from 2007[9], 447 from 2008, and 3,337 from the first half of 2009. (ECF No. 203 at 17). In sum, defendant failed to preserve between 3,784[10] and 8,542[11] applicant files out of a total of between 31,462[12] and 53,653[13] applicants for all OpCos between August 7, 2007, and June 30, 2009.

---

[7] This date is one year prior to June 11, 2007, the earliest date that a charge was filed. (ECF No. 203-1).

[8] This date is one year prior to August 7, 2008, the date that plaintiff informed defendant that it was expanding the scope of its investigation. (ECF No. 203-8).

[9] The data provided by the parties is divided by year, such that it is impossible to tell which applications from the year 2007 defendant had a duty to preserve (i.e., which applications were dated after August 7, 2007).

[10] This is the total number of files that defendant failed to produce from 2008 and 2009.

[11] This number includes all 4,668 files that defendant did not produce from the year 2007. Because it is impossible to tell which applications from this year that defendant had a duty to preserve, it is impossible to determine the total number of files that defendant failed to preserve.

[12] This is the total number of applicants for the years 2008 and the first half of 2009. (ECF No. 203 at 17).

[13] This number includes all 22,191 applicants from the year 2007. Because it is impossible to tell when each of these individuals applied to defendant, it is impossible to determine how many of these files defendant had a duty to preserve (i.e., which applications were dated after August 7, 2007). (ECF No. 203 at 17).

As to the alleged destruction at the CCF OpCo during the year 2006, plaintiff reports that defendant failed to produce 144 "non-hire" applications. (ECF No. 203 at 19). Plaintiff does not specify, however, which of these applications that defendant had a duty to preserve, i.e. which applications were dated after June 11, 2006. Defendant may have failed to preserve anywhere between zero and 144 applications, and I cannot determine the extent of spoliation from the CCF OpCo for the year 2006 based on the information available to me. Nonetheless, while defendant did not fail to preserve the total amount of applications alleged by plaintiff, plaintiff has established defendant did fail to preserve a number of applications from all OpCos dating back to August 7, 2007, and likely some applications from the CCF OpCo for the year 2006. The first element of the Thompson analysis is satisfied.

### ii. Culpability

The second element to consider is whether the destruction or loss of evidence was accompanied by a "culpable state of mind." Thompson, 219 F.R.D. at 101. Plaintiff alleges that "[d]efendant did not simply fail to pay attention to its legal duties, fail to notice when they accrued, fumble its litigation hold, or suffer the misfeasance of one or two individuals with sole control over the documents," but that defendant acted willfully and in bad faith. (ECF No. 203 at 30). Defendant argues that plaintiff "has not proffered any evidence that [defendant] failed to produce paper applications in bad faith or that it engaged in egregious conduct." (ECF No. 218 at 70). Three possible states of mind "can satisfy the culpability requirement: bad faith/knowing destruction, gross negligence, and ordinary negligence." Goodman, 632 F. Supp. 2d at 518 (citing Thompson, 219 F.R.D. at 101). The Fourth Circuit only requires a showing of fault, with the degree of fault impacting the severity of sanctions. Silvestri, 271 F.3d at 590. For the reasons

discussed below, I find that there is insufficient evidence to conclude that defendant acted willfully or in bad faith, but there is sufficient evidence to conclude that defendant was negligent.

Ordinary negligence is "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]" <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>, 269 F.R.D. 497, 529 (D. Md. 2010) (citing <u>Black's Law Dictionary</u> 846 (Bryan A. Garner ed., abridged 7th ed., West 2000)). Gross negligence "is something more than carelessness," which "'differs from ordinary negligence only in degree, and not in kind.'" <u>Id.</u> (citing <u>Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.</u>, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010)). Willfulness and bad faith both require "intentional, purposeful, or deliberate conduct." <u>Id.</u> at 530 (citing <u>Buckley v. Mukasey</u>, 538 F.3d 306, 323 (4th Cir. 2008)). For a court to find that a party acted willfully, "it is sufficient that the actor intended to destroy the evidence." <u>Id.</u> (citing <u>Goodman</u>, 632 F. Supp. 2d at 520). Bad faith, on the other hand, "requires 'destruction for the purpose of depriving the adversary of the evidence.'" <u>Id.</u> (quoting <u>Powell v. Town of Sharpsburg</u>, 591 F. Supp. 2d 814, 820 (E.D.N.C. 2008)).

In <u>Victor Stanley</u>, this court found that defendants "set out to delete, destroy, or hide thousands of files containing highly relevant ESI pertaining to [p]laintiff's claims . . . lied about their ESI production; obstructed the discovery process; and intentionally destroyed evidence when they were aware of the lawsuit." <u>Id.</u> at 531. Here, however, plaintiff has not provided any evidence that defendant destroyed the paper applications "for the purpose of depriving [plaintiff] of the evidence" or that defendant "intended to destroy the evidence." <u>Id.</u> Rather, plaintiff's arguments focus on defendant's failure to implement a proper litigation hold. (ECF No. 203 at 24–27). Accordingly, I do not find that plaintiff has established that defendant acted willfully or in bad faith.

In determining whether defendant's conduct was negligent, the court must first consider defendant's failure to institute a litigation hold or advise employees to retain documents. Generally, if a company has a document retention or destruction policy, it must suspend that policy and "implement a 'litigation hold' to ensure the preservation of relevant documents" once the preservation duty attaches. Goodman, 632 F. Supp. 2d at 511 (citing Thompson, 219 F.R.D. at 100). Courts have found that the quality of the litigation hold instituted directly correlates to the level of culpability and sanction that attaches to the inadequacy of those efforts, if any. When no litigation hold has been instituted, courts have found such conduct to be grossly negligent. In Cognate Bioservices, Inc., et al. v. Smith, Civ. No. WDQ-13-1797, 2015 WL 5158732 (D. Md. August 31, 2015), the defendant failed to institute a litigation hold at his consulting firm. Id. at *5. As a result, multiple potentially relevant emails and documents were deleted by employees. Id. The court noted "had [defendant] instituted any litigation hold–even a less-than-ideal litigation hold–the circumstances might have warranted a finding of regular negligence." Id. (citing Victor Stanley, 269 F.R.D. at 529). But, under the circumstances, since no steps were taken to preserve such evidence, the court found the defendant's conduct to be grossly negligent. Id.

In this case, there is ample evidence that defendant failed to properly institute a litigation hold. As previously discussed, defendant's duty to preserve paper applications attached to its CCF OpCo on June 11, 2007, and to all other OpCos on August 7, 2008. Defendant was required to implement a litigation hold once this duty attached. Defendant's designee testified that it believed it first became aware of a litigation hold in late 2008 but could not recall any details about the hold. (ECF No. 203 at 25). Defendant's designee could not recall whether the hold required the OpCos to preserve paper applications. Id. Defendant's designee also could not recall what was included in litigation hold notices, and defendant could not produce any such notices. Id. Plaintiff also

provides evidence that, if there was a litigation hold, it was not communicated to all OpCo HR managers.[14]  (ECF No. 203 at 26).

Even if there was a litigation hold, however, defendant's designee testified that the litigation hold was merely self-enforced.[15]  Id.  "A party's obligations 'do not end with the implementation of a litigation hold . . . [c]ounsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents."  In re Ethicon, Inc. Pelvic Repair Systems Product Liability Litigation, 299 F.R.D. 502, 521 (S. D. W. Va. 2014) (quoting Zubulake v. UBS Warburg, LLC, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Zubulake V")). "At a minimum . . . counsel should have educated employees on what measures were expected of them to collect and preserve material evidence."  Id.  Here, however, even if there was a litigation hold, it was not properly implemented, and there was no monitoring for compliance.  Under the circumstances, I conclude that defendant's failure to implement any measures to ensure that potentially relevant evidence would be preserved constituted at least ordinary negligence.[16]  The second element of the Thompson analysis is satisfied.

### iii.    Relevance and Prejudice

The third element that must be met before sanctions are imposed is that the destroyed or altered documents are relevant to the proponent's claims and defenses.  In the Fourth Circuit, "a finding of 'relevance' for purposes of spoliation sanctions is a two-pronged finding of relevance and prejudice."  Victor Stanley, 269 F.R.D. at 532.  When the alleged spoliator is found to have

---

[14] For example, the Vice-President of Human Resources at the Springfield and Florida OpCos through June of 2009 testified that she never received instructions to suspend normal document retention policies and comply with a litigation hold.  (ECF No. 203-33 at 2).

[15] Defendant's designee testified that it was her understanding that "any recipient of the notice was responsible for retaining documents in that person's control."  (ECF No. 203-29 at 16).

[16] I need not determine whether defendant's conduct constituted gross negligence at this time, given the type of sanctions requested by plaintiff.  As further discussed below, the applicability of the sanctions sought by plaintiff does not turn on the level of negligence, but rather on whether defendant acted willfully or in bad faith.

acted willfully or in bad faith in failing to preserve evidence, "the relevance of that evidence is presumed in the Fourth Circuit." Id. at 532. When a failure to preserve evidence is the result of either ordinary or gross negligence, as is the case here, the plaintiff must establish that the lost documents were relevant to their case. Thompson, 219 F.R.D. at 101 (quoting Zubulake IV, 220 F.R.D. at 220).

Evidence is relevant if a "reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." Victor Stanley, 269 F.R.D. at 531 (quoting Thompson, 219 F.R.D. at 101). Here, plaintiff alleges that the missing paper applications are relevant to its pattern or practice claim. (ECF No. 203 at 33). Specifically, the missing paper applications here would likely be relevant to plaintiff's pattern or practice claim, as the applications would allow plaintiff to evaluate the qualifications of the Phase I female claimants and male hires for individual comparisons. (ECF No. 203 at 34). Similarly, this evidence would allow plaintiff to evaluate the reasons given by defendant for why individual female claimants were not hired. Id. Indeed, defendant does not challenge the relevance of these documents in its Opposition. Accordingly, I find that a reasonable factfinder could conclude that these missing employment records would have supported plaintiff's claims.

Turning to whether plaintiff has been prejudiced due to the spoliation, spoliation is prejudicial if "a party's ability to present its case or to defend is compromised." Victor Stanley, 269 F.R.D at 532 (citing Silvestri, 271 F.3d at 593–94). Here, plaintiff alleges that defendant's conduct has prejudiced plaintiff "by preventing it from identifying and preventing it from identifying and evaluating aggrieved females whom it could have used as Phase I claimants, and from seeking relief for those unidentified non-Phase I claimants during Phase II." (ECF No. 203 at 33). Plaintiff has also alleged that it is prejudiced by the lack of "individual comparator

information needed to rebut pretextual explanations for why [defendant] did not hire [plaintiff's] Phase I claimants" and that "[t]he failure to preserve has also opened the door for [defendant] to attack [plaintiff's] statistical populations as insufficiently representative." Id. Plaintiff further details how the spoliation prejudiced the claims brought on behalf of specific Phase I claimants.[17] (ECF No. 203 at 35–39).

Defendant alleges that plaintiff was not deprived "of any evidence it needs to establish its pattern or practice claim." (ECF No. 218 at 71). Defendant argues that the issue in Phase I is whether defendant has a companywide pattern or practice of failing to hire women into operative positions, which can be proven through statistical and anecdotal evidence. (ECF No. 218 at 71–72). Defendant further asserts that plaintiff submitted an expert report supporting its pattern or practice theory and that, in this report, its expert did not claim that the missing applicant data prevented her from making relevant findings. (ECF No. 218 at 73). In response to plaintiff's argument that "[t]he failure to preserve has also opened the door for [defendant] to attack [plaintiff's] statistical populations as insufficiently representative," (ECF No. 203 at 33), defendant argues that its expert does not base any challenges on missing data, but rather on plaintiff's expert's flawed methodology and failure to use all data that was available for analysis. (ECF No. 218 at 74–75).

Additionally, defendant claims that plaintiff was not prejudiced by its inability to identify and evaluate aggrieved females. (ECF No. 218 at 74). Defendant argues that plaintiff was able to select nineteen female applicant who applied during the years in question, between 2004 and mid-

---

[17] In one example, defendant preserved the application for a female applicant but failed to preserve the applications of five males hired for the same position over the next few months. (ECF No. 203 at 36). In another example, defendant failed to preserve a female applicant's file, and the only data that remains is that she was "not selected" and that "better candidates," all male, were selected. Id.

2009.[18]  Id.  Similarly, defendant argues that plaintiff did not experience prejudice to the claims brought on behalf of the Phase I claimants.  Rather, defendant argues, these claims will not be tried until Phase II, and the claimants' only role in Phase I is to provide anecdotal testimony in support of the pattern or practice claim, so there is no prejudice at this time.  (ECF No. 218 at 75).

In response, plaintiff asserts that paper applications and related documents "are essential to proving the pretext of [d]efendant's asserted reasons for not selecting the female applicant," particularly when plaintiff "has the burden of actually proving [defendant's] representations to be false."  (ECF No. 221 at 21–22 (emphasis in original)).  Furthermore, plaintiff argues, it is "using the circumstances of Phase I witness' non-selections to help prove a pattern or practice of discrimination . . . their qualifications, those of their comparators, [defendant's] purported reasons for not selecting them, and proof of pretext is all at play in Phase I liability phase."[19]  (ECF No. 221 at 12).  Plaintiff further argues that the prejudice is significant in light of defendant's second expert report, which claims that the disparity between the number of male and female applicants hired was due to a disparity in prior experience.  (ECF No. 221 at 28).  Specifically, plaintiff argues that its expert cannot properly rebut defendant's expert reports without data from the spoliated applications.  (ECF No. 221 at 29).

Here, plaintiff alleges that PFG "has maintained and continues to maintain a standard operating procedure of discriminating against females in its hiring of operatives at its Broadline facilities."  (ECF No. 5 at 19).  As noted by plaintiff, "[t]he relative qualifications of the claimant and comparators as they existed on the documents reviewed by the decisionmakers, and [d]efendant's actual deliberative process, is critically at issue."  (ECF No. 221 at 22 (emphasis in

---

[18] Defendant argues that female applicants who applied during these years represented 35% of the total number of female applicants but represent 48% of the total Phase I claimants selected by plaintiff.  Id.  Defendant argues that this "shows clearly that [plaintiff's] claim that it was prejudiced in selecting its 40 Phase I claimants is false."  Id.
[19] Plaintiff argues that "[o]nly the amounts of individual damages are reserved for Phase II."  Id.

original)). Plaintiff's ability to present evidence in support of its pattern or practice claim is compromised by the spoliation of such documents. Although individual claimants may testify anecdotally, their testimony does not cure this prejudice, as they will only be able to testify as to their own qualifications. Additionally, plaintiff is harmed by its inability to offer paper applications and related documents to rebut defendant's proffered explanations for not hiring female applicants. As to plaintiff's ability to present expert witness testimony, I do not have sufficient information before me to determine whether plaintiff has experienced prejudice at this time. As discussed further below, this issue may be more appropriately presented by a motion in limine, including a Daubert motion, to the trial judge. Nonetheless, excluding plaintiff's ability to present expert witness testimony, based on the record before me, I find that plaintiff has been prejudiced by this spoliation, plaintiff's ability to present its case has been compromised, and the final element of the Thompson analysis has been satisfied.

**C. Sanctions**

After finding that all three elements of the Thompson analysis are satisfied, a court may impose sanctions that must serve "the purpose of leveling the evidentiary playing field and . . . the purpose of sanctioning the improper conduct." Vodusek, 71 F.3d at 156. Here, plaintiff requests a variety of "remedial and punitive sanctions" that it argues are warranted because "this is a rare case in which a party's behavior has been so egregious, and/or the prejudice so substantial." (ECF No. 203 at 42).

**i. Limited Default Judgment**

Plaintiff first requests that the court grant limited default judgment against defendant for the period of January 1, 2004, through June 30, 2009, or in the alternative, grant limited default

judgment against defendant for six OpCos in which the spoliation has been most severe and for the applicants for whom no application materials remain. (ECF No. 203 at 42–43).

The Fourth Circuit has indicated, however, that courts should only impose sanctions that dispose of a case, such as a dismissal or default judgment,[20] in the most extreme circumstances:

> [T]o justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

Silvestri, 271 F.3d at 593. "Although Silvestri posits an either/or test . . . this [c]ourt has not terminated a case where a spoliator acted in bad faith, absent a showing of substantial prejudice." Victor Stanley, 269 F.R.D. at 535 (citations omitted). In Silvestri, the plaintiff allowed the "sole piece of evidence" in a products liability action, a vehicle, to be repaired and sold without giving defendant notice and an opportunity to inspect it. Id. at 585. The court found that plaintiff's actions "denied [defendant] access to the only evidence from which it could develop its defenses adequately," and was therefore "so prejudicial that it substantially denied the defendant the ability to defend the claim." Id. at 593–94.

Here, unlike Silvestri, defendant's spoliation does not justify the severe sanction of a default judgment. While plaintiff has established that it is prejudiced by the spoliation, plaintiff has not established that it was denied the only means available to prove its case. As noted by defendant, plaintiff has submitted an expert report "which [plaintiff] asserts establishes that [defendant] has a pattern or practice of failing to hire women for operative positions."[21] (ECF No.

---

[20] Most of the Fourth Circuit cases involving sanctions for spoliation of evidence arise in the context of a defendant asking for dismissal of a plaintiff's claims because of destruction of evidence by the plaintiff. As the Fifth Circuit has noted, "[b]ecause ... rendering default judgment is equally as harsh a sanction as dismissing the case of a plaintiff with prejudice, we cite cases involving these sanctions interchangeably." Pressey v. Patterson, 898 F.2d 1018, 1021 n.2 (5th Cir. 1990). The court here cites cases involving requests for default judgment and for dismissal interchangeably.
[21] Plaintiff also states that "[a]pplication spoliation may not have prevented [plaintiff] from rendering a number of expert statistical opinions." (ECF No. 221 at 28).

218 at 72). Additionally, plaintiff has designated 40 Phase I claimants to provide anecdotal testimony to support plaintiff's pattern or practice claim. (ECF No. 218 at 74). Specifically, these claimants can testify "about their work experience and qualifications, and their experience when they applied for a position at PFG, i.e., whether they were interviewed, whether they were hired, and whether anyone at PFG said anything about women working at PFG." (ECF No. 218 at 76). Accordingly, I find that the severe sanction of a default judgment is not warranted.

### ii.      Adverse Inference Instructions

Plaintiff also asks that the court instruct the jury with a mandatory adverse instruction stating that defendant "had legal obligations to preserve approximately a third of their paper applications from 2004 to 2009 at a time when litigation was foreseeable, willfully failed to retain them all at any facility, retained none for non-hires at the VFG and Middendorf facilities and retained none for 1,721 females; and that the jury shall presume these applications, as a whole or in individual cases, contained information detrimental to [d]efendant." (ECF No. 203 at 43). Alternatively, plaintiff asks for a permissive inference instruction, specifically requesting that the court "instruct the [j]ury as to the fact and extent of spoliation it finds, as well as the fact that [d]efendant destroyed the evidence at a time when it knew it had a legal duty to preserve it, affording the [j]ury a permissive inference as to what the evidence may have shown." (ECF No. 203 at 44). Defendant argues that these requests are improper, as "there is no showing that [defendant] acted willfully or in bad faith," and "the fact that there are missing paper applications has no bearing on and is not relevant to the issue to be tried in Phase I, i.e., whether [defendant] had a pattern or practice of failing to hire women, and thus there is no prejudice to [plaintiff]." (ECF No. 218 at 81).

A court may use its discretion to "order an adverse inference instruction, which informs a jury that it may 'draw adverse inferences from . . . the loss of evidence, or the destruction of evidence,' by assuming that failure to preserve was because the spoliator was aware that the evidence would have been detrimental." Victor Stanley, 269 F.R.D. at 535 (quoting Vodusek, 71 F.3d at 156). "The court may instruct the jury that 'certain facts are deemed admitted and must be accepted as true'; impose a mandatory, yet rebuttable, presumption; or 'permit[] (but . . . not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party.'" Id. (quoting Pension Comm. of Univ. of Montreal Pension Plan, 685 F. Supp. 2d at 470–71). To impose any adverse jury instruction, "the court 'must only find that the spoliator acted willfully in the destruction of evidence.'" Victor Stanley, 269 F.R.D. at 536 (quoting Goodman, 632 F. Supp. 2d at 519). "[N]egligence or even gross negligence is not sufficient in this Circuit." Id. An adverse inference instruction "cannot be drawn merely from [defendant's] negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and [defendant's] willful conduct resulted in its loss or destruction." Vodusek, 71 F.3d at 156.

Here, plaintiff has not established that defendant acted willfully or in bad faith in failing to preserve the relevant applications. Although plaintiff has established that defendant was negligent, negligent conduct is insufficient to warrant the sanction of an adverse inference instruction. See Victor Stanley, 269 F.R.D. at 526 ("[A]n adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence because it believed that the evidence was harmful to its case does not flow from mere negligence[.]") Accordingly, plaintiff's requests for mandatory and permissive adverse jury instructions are denied.

### iii.     Preclusion of Evidence and Summary Judgment

Plaintiff also asks that defendant be precluded from (1) using as evidence in <u>Daubert</u> motions, summary judgment proceedings, or trial the application material of male hires and comparators of certain Phase I claimants; (2) stating or implying opinions faulting plaintiff's expert "for using in her calculations fewer items of specific application information (e.g., licensure data points, resume material) than PFG can demonstrate it has actually produced to [plaintiff]"; and (3) "from presenting argument extrapolating samples to any populations of documents larger than what PFG can prove it actually produced."  (ECF No. 203 at 43).  Defendant argues that this request is inappropriate as to the Phase I claimants, as the individual claims will not be addressed until Phase II, and plaintiff has not established any basis or authority for such a sanction.  (ECF No. 218 at 78).  Defendant further argues that plaintiff's request as to opinions faulting plaintiff's expert "is unwarranted because neither [defendant] nor [defendant's expert] have ever [faulted plaintiff's expert] for using data that was not produced to [plaintiff]."  (ECF No. 218 at 62).

As noted by defendant, plaintiff has failed to provide any legal support for this type of sanction and its applicability to this case.  Furthermore, I find that this request is premature.  The three issues raised by plaintiff in its request are all evidentiary issues that are more appropriately presented in motions in limine to preclude evidence or in the form of <u>Daubert</u> motions asking the trial court to exclude certain expert opinions.  Accordingly, because this request is more appropriately addressed to the trial judge at a later time, this request is denied without prejudice.

Plaintiff also requests that defendant be precluded from moving for summary judgment as to plaintiff's pattern or practice claim, twelve specific Phase I claimants whose claims have been prejudiced by defendant's spoliation, and 1,721 potential Phase II claimants that plaintiff will not be able to identify due to the spoliation of their applications.  (ECF No. 203 at 44).  Plaintiff relies

solely on Equal Employment Opportunity Commission v. JP Morgan Chase Bank, North America, 295 F.R.D. 166, 174 (S.D. Ohio 2013), recons. denied, 2013 WL 1787577 (S.D. Ohio Mar. 20, 2013), a case in which the court exercised its discretion to deny defendant's summary judgment motion, to support its position. In that case, the court held that denial of defendant's motion for summary judgment was necessary to "counter[] any summary judgment advantage that [d]efendant may have obtained by its conduct that could contribute to [p]laintiff never reaching a jury." Id. at 174. Defendant argues that this sanction is not warranted. Specifically, defendant argues, "[u]nlike the cases cited by [plaintiff] in support of its request . . . the missing data in this case does not hamper [plaintiff's] ability to prove its claim or prevent fair consideration of the full merits of this litigation in Phase I." (ECF No. 218 at 77). Defendant also reiterates its argument that this request is inappropriate as to the Phase I claimants, as the individual claims will not be addressed until Phase II, and plaintiff has not established any basis or authority for such a sanction. (ECF No. 218 at 78).

Plaintiff has failed to provide any legal support for its request that defendant not be permitted to file a summary judgment motion. Indeed, even in JPMorgan Chase Bank, the defendant was not precluded from filing a summary judgment motion as requested by plaintiff here. Here, the trial judge can decide what impact the evidence, or lack of evidence, has at the summary judgment stage. Further, as noted by defendant, the court's inherent power to impose sanctions "must be exercised with the greatest restraint and caution, and then only to the extent necessary." United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993). I find that the requested sanction is inappropriate, given defendant's lack of bad faith and plaintiff's expert report which claims that it does have sufficient evidence to provide an opinion in support of plaintiff's claim. Plaintiff's request is denied.

### iv. Extension of Discovery

Finally, plaintiff asks that if any of the spoliated evidence is later discovered, that plaintiff be allowed 60 days to redesignate Phase I claimants, take depositions of any newly revealed decisionmakers, and, "if any application information is found in such quantity as to indicate supplementation of [plaintiff's] expert report," that plaintiff be allowed until the time of pretrial disclosures to key in the information, prepare the data sets, and supplement its expert statistical opinion pursuant to Fed. R. Civ. P. 37(c)(1). (ECF No. 203 at 44). This request is denied, without prejudice, as it is premature at this time. If any of the spoliated evidence is later discovered, plaintiff may raise this issue to be addressed by the court at that time.

## III. Spoliation of Electronically Stored Information ("ESI")

### A. Legal Standard

As discussed above, federal courts have two sources of authority for the imposition of sanctions due to spoliation, Federal Rule of Civil Procedure 37 and the court's inherent authority to control the judicial process. Goodman v. Praxair Servs., Inc., 632 F. Supp. 2d 494, 505–06 (D. Md. 2009). Plaintiff relies on the latter source of authority in its ESI Spoliation Motion, while defendant argues that Rule 37(e) is the proper source of authority for spoliation of ESI. (ECF No. 218 at 33). Federal Rule of Civil Procedure 37(e), as amended in 2015, states:

(e) If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

   (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

   (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

      (A) presume that the lost information was unfavorable to the party;

> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. Pro. 37(e).  As noted by defendant, the Committee Notes on the 2015 Amendment to this Rule state that the amended rule "forecloses reliance on inherent authority or state law to determine when certain measures should be used."  (ECF No. 218 at 33).  Defendant, therefore, argues that the court may not rely on its inherent authority to impose sanctions, as argued by plaintiff, and must rely on Rule 37(e).  Id.

In response, plaintiff argues that, pursuant to the Supreme Court's Order amending Rule 37, the amended rule took effect on December 1, 2015, and "govern[s] all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." (ECF No. 205 at 31–32 (quoting Supreme Court Order, April 29, 2015, https://www.supremecourt.gov/orders/courtorders/frcv15(update) _1823.pdf).  Plaintiff argues that this amendment should not govern this case, as plaintiff filed suit in June of 2013, served the discovery requests at issue in April 2014, and defendant's duty to preserve evidence attached, and the alleged destruction of such evidence occurred, before 2015.  (ECF No. 205 at 32).  Defendant argues that it is "just and practicable" to apply the amended Rule here, as the motion was filed two and a half years after the amended Rule went into effect.  (ECF No. 218 at 35).

At the outset, however, I find it unnecessary to determine which standard applies in this case.  Under either standard, as a threshold issue, the court must find that there was a destruction of evidence that the party had a duty to preserve.  See Fed. R. Civ. Pro. 37(e) (allowing the court to impose sanctions when ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it"); Thompson v. U.S. Dep't of Hous. & Urban Dev., 219 F.R.D. 93, 101 (D. Md. 2003) (requiring that the court find that

"the party having control over the evidence had an obligation to preserve it when it was destroyed or altered" before imposing sanctions). For the reasons discussed below, I find that plaintiff has only established that defendant failed to preserve evidence relating to internal complaint documents and that the sanction sought by plaintiff for the spoliation of these documents is inappropriate at this juncture.

## B. Duty to Preserve

Plaintiff alleges that defendant failed to create an appropriate litigation hold on its employees' emails and electronic documents and that, accordingly, defendant has failed to produce relevant ESI that it had a duty to preserve. (ECF No. 205 at 14–15). Plaintiff specifically alleges that defendant has failed to preserve emails belonging to nineteen custodians[22] (ECF No. 205 at 19–20) and documents related to internal complaints of gender hostility or discrimination (ECF No. 205 at 24). As discussed previously, defendant was on notice after June 11, 2007, to preserve any ESI related to the charges filed by Julie Lawrence, Jason Geib, and Kyle Gardner at the CCF OpCo. Defendant was further placed on notice to preserve any ESI related to plaintiff's pattern or practice claim after August 7, 2008.

### i. Custodian Emails

In its ESI Motion, plaintiff named nineteen custodians "of greatest interest" who were "named in [plaintiff's] Complaint, named in complaints filed privately, or who themselves alleged gender discrimination" and alleged that defendant failed to preserve all relevant emails from these custodians. (ECF No. 205 at 18). Three of these individuals, Julie Lawrence, Jason Geib, and Kyle Gardner, are former CCF employees who filed the initial charges in the summer of 2007. (ECF No. 205 at 19). Another three individuals, Dave Russ, Jeff Wismans, and Dan Peckskamp,

---

[22] These custodians are employees of defendant who alleged gender discrimination or allegedly engaged in discriminatory behavior. (ECF No. 205 at 18).

were Vice Presidents of Operations that Kyle Gardner alleged opposed hiring female workers. (ECF Nos. 205-5, 205-6). Two individuals alleged gender discrimination by defendant.[23] (ECF No. 205 at 19). Nine of these individuals[24] held management positions and allegedly engaged in discriminatory behavior during their employment. (ECF No. 205 at 19–20). Finally, one individual, Jeff Williamson, replaced Dan Peckskamp as Vice President of Operations. (ECF No. 205 at 20).

Pursuant to the Protocol for the Search of Defendant Performance Food Group, Inc.'s Electronic Mail Collections (ECF No. 113) ("ESI Protocol"), defendant searched its email data for those custodians listed in the ESI Protocol[25] and produced all relevant, responsive, and non-privileged documents to plaintiff. (ECF No. 218 at 23). While defendant's email data included 3,383 email backup tapes, the ESI Protocol did not require defendant to restore and search all of its email backup tapes, but rather only required defendant to restore and search "one full weekly backup of each email server for each quarter of each year for the time period of January 2004 through January 2010," (ECF No. 113 at 2), which constituted approximately 25 percent of all tapes. (ECF No. 218 at 36). Plaintiff argues that defendant has failed to preserve all relevant emails from these custodians, primarily relying on defendant's "meager overall email production." (ECF No. 205 at 21). Additionally, plaintiff argues that defendant failed to preserve the passwords

---

[23] One individual, Deidre Robinson, was a Vice President of Training and Development who "told EEOC investigators in 2008 that [d]efendant fostered a discriminatory and hostile working environment for women." (ECF No. 205 at 19 (citing ECF No. 205-43)). Another, Chief Human Resources Officer Charlotte Perkins, sued defendant in a separate lawsuit. Id.

[24] These individuals include Graylon MacFall (Regional President), Bogdan Lucyzk (Springfield warehouse manager), Paul Green (Springfield Vice President of Operations), Dwight Gorsuch (CCF President), Rudy Ayala (Little Rock warehouse manager and director), James McColloch (VFG Vice President of Operations), Donnie Miniard (Somerset supervisor of transportation), Byron Flores (AFI warehouse supervisor), and Phillip Franzoni (Temple and Springfield warehouse manager). (ECF No. 205 at 19–20). Also included is Christopher Stacey, who allegedly worked as a warehouse manager at the Lester and Springfield OpCos "during a period in which Green gave orders not to hire females there." (ECF No. 205 at 19).

[25] As noted by defendants, four of the "custodians of greatest interest" (Lawrence, Ayala, Flores, and Miniard) were not included on the ESI Protocol. (ECF No. 218 at 40).

to 3,326 password-protected documents found within the emails that were produced. (ECF No. 205 at 23).

### (1) Julie Lawrence, Jason Geib, and Kyle Gardner

As to the three individuals who initially filed charges in this case, Julie Lawrence, Jason Geib, and Kyle Gardner, defendant has produced zero emails from Lawrence's email data, fifty-four emails from Geib's email data,[26] and nineteen from Gardner's email data. Defendant had a duty to preserve all relevant emails from these custodians beginning on June 11, 2007, the date that the first charge was filed. Defendant notes that Julie Lawrence, a warehouse worker, did not even have an email account with defendant. (ECF No. 218 at 40). For Geib and Gardner, plaintiff fails to offer any evidence, however, that defendant did not preserve all relevant emails from these individuals, beyond a general argument that, because defendant's overall production was "meager," more emails must have existed.[27] (ECF No. 205 at 21).

As argued by defendant, plaintiff's "contention that an email production is 'meager' does not mean relevant evidence was destroyed." (ECF No. 218 at 38 (citing Harris v. Koenig, 271 F.R.D. 356, 370 (D.D.C. 2010) ("If plaintiffs are speculating that documents responsive to these requests do exist, there must be a reasonable deduction that that is true, and not a mere hunch."); Freedman v. Weatherford Int'l, 2014 WL 4547039, *3 (S.D.N.Y. Sept. 12, 2014) (denying further discovery despite evidence of three emails missing from defendant's production, explaining that the Federal Rules "do not require perfection" in discovery, and noting none of the other allegedly missing relevant documents would have been identified via the keyword search). This is especially

---

[26] Plaintiff notes that "[a]ll 54 consisted of separate sections of a corporate policy manual and its transmittal." (ECF No. 205 at 20).
[27] While plaintiff does note that defendant failed to produce the emails that it attached to its position statements as to the Jason Geib and Kyle Gardner charges in 2007, upon review of the emails, the emails are not relevant to the instant case, as they only pertain to Geib's overall performance and Family and Medical Leave Act ("FMLA") requests and Gardner's overall performance and racial discrimination claims. (ECF Nos. 205-7, 205-8).

true in light of the fact that defendant only restored a sample of its backup tapes, as it is possible that, if relevant emails were missing, the emails were not destroyed, but rather located on backup tapes that were not sampled. (ECF No. 218 at 39 (citing ECF No. 113 at 1–2)). Accordingly, I find that plaintiff has failed to meet its burden of establishing that defendant failed to preserve relevant emails from Julie Lawrence, Jason Geib, or Kyle Gardner that it had a duty to preserve. Plaintiff's motion is denied as to these custodians.

### (2) Dave Russ, Jeff Wismans, and Dan Peckskamp

As to the three individuals named in the initial charges, Dave Russ, Jeff Wismans, and Dan Peckskamp, defendant produced zero emails from Russ' email data, thirteen emails from Wismans' email data, and four[28] emails from Peckskamp's email data. (ECF No. 205 at 20). In his initial charge, dated July 15, 2007, Kyle Gardner alleged that corporate management, including Russ, Wismans, and Peckskamp, opposed hiring female workers. (ECF No. 205-5). At that point, defendant was placed on notice of its duty to preserve any relevant documents pertaining to these allegations or its investigation thereof, including any emails from these individuals. Plaintiff fails to offer sufficient evidence, however, that defendant did not preserve all relevant emails from these individuals.

As to Dave Russ, he separated from defendant on May 5, 2007. (ECF No. 218 at 54 n.110). Defendant represented that "[a]ctive email accounts of employees are purged after they separate from the company pursuant to regular business practices." (ECF No. 218 at 41). Defendant has also stated that Russ' emails were "purged before any duty to preserve arose." Id. Plaintiff has not offered any proof to rebut defendant's assertion that Russ' emails were deleted before it was placed on notice of its duty to preserve relevant emails on July 15, 2007. Plaintiff has not met its

---

[28] Plaintiff notes that these emails consist of "[t]hree EEOC Notice of Charges and the email transmittal." (ECF No. 205 at 20).

burden of establishing that defendant destroyed relevant emails from Russ that it had a duty to preserve.[29]

As to Jeff Wismans, the only argument advanced by plaintiff is its general argument that defendant's overall email production was "meager." (ECF No. 205 at 21). Absent further evidence that defendant has failed to preserve Wismans' emails that are relevant to plaintiff's claims, this general argument is insufficient to establish that defendant destroyed relevant evidence that it had a duty to preserve, especially in light of the fact that not all backup tapes were sampled, and relevant emails may still exist on unsampled tapes. (ECF No. 218 at 39). In sum, plaintiff's arguments amount to mere speculation, and plaintiff has failed to meet its burden of establishing that defendant failed to preserve emails from Jeff Wismans that it had a duty to preserve.

As to Dan Peckskamp, plaintiff alleges that defendant failed to preserve his emails and relies on the small number of emails produced from Peckskamp's account and defendant's inability to locate Peckskamp's work laptop to support this argument. (ECF No. 205 at 13, 25). As noted by defendant, however, it restored the sampled backup tapes which contained Peckskamp's emails, searched those emails, and produced all non-privileged responsive emails. (ECF No. 218 at 43). Peckskamp testified that he did not remember deleting emails, and plaintiff offers no evidence that there would be additional emails on Peckskamp's laptop that would not also be located on its server, which defendant already searched.[30] (ECF No. 218 at 44). Finally, while plaintiff argues that Peckskamp produced one hundred pages of personally-saved printouts of electronic documents that defendant never produced (ECF No. 221 at 41), these appear to have been from

---

[29] Plaintiff does allege that evidence that relevant emails existed are shown by emails printed by defendant and placed in Russ' personnel file, but offers no evidence that these emails were printed after defendant's duty to preserve evidence arose. (ECF No. 205 at 41 n.17 (citing ECF No. 206-25)).

[30] As noted by defendant, plaintiff "did not ask Peckskamp about whether unique relevant emails were stored on his [work laptop]. Nor has [plaintiff] presented other evidence demonstrating that relevant emails would have been stored on his [work laptop] and not have been available from the copies of his emails found on the sampled backup tapes." (ECF No. 218 at 44).

Peckskamp's personal email account, which defendant had no duty to preserve. (ECF No. 218 at 31 n.96). Consequently, plaintiff has not met its burden of establishing that defendant failed to preserve relevant emails from Peckskamp's PFG email account that it had a duty to preserve. For the foregoing reasons, Plaintiff's motion is denied as to Russ, Wismans, and Peckskamp.

### (3) Deidre Robinson, Graylon MacFall, Dwight Gorsuch, Rudy Ayala, James McColloch, and Byron Flores

Of these six employees, one individual, Deidre Robinson, alleged that defendant created a discriminatory and hostile work environment for women, and the other five allegedly engaged in discriminatory behavior during their employment. (ECF No. 205 at 18–19). None of these employees were employed at the CCF OpCo or named in the initial charges by Lawrence, Geib, and Gardner, so defendant was under no duty to preserve their emails until August 7, 2008, when defendant was placed on notice of a pattern or practice claim. All six of these individuals, however, were no longer employed by defendant as of this date, and, pursuant to defendant's standard policy, these custodians' email accounts would have been purged upon termination. (ECF Nos. 205 at 18–19, 218 at 41). Plaintiff has offered no evidence that defendant purged these employees' email accounts after August 7, 2008. Accordingly, plaintiff has not met its burden of establishing that defendant failed to preserve relevant emails from accounts that it had a duty to preserve. Plaintiff's motion is denied as to these custodians.

### (4) Charlotte Perkins

Perkins, a former Chief Human Resources Officer, sued defendant in state court in July 2008, and filed a charge of sex discrimination against defendant with plaintiff. (ECF No. 205 at 14). Defendant produced forty-two[31] emails from her email data. (ECF No. 205 at 20). Defendant

---

[31] Plaintiff notes that "[h]alf were transmissions of correspondence with [Office of Federal Contract Compliance Programs] and/or the three CCF charges; seven were training PowerPoints; only one concerned an internal investigation of a discrimination complaint." (ECF No. 205 at 20).

had a duty to preserve all relevant emails from her account after August 7, 2008, when defendant was placed on notice of a pattern or practice claim.[32]   Plaintiff alleges that defendant destroyed Perkins' work laptop, and the emails contained therein, in 2011, as part of an agreement following settlement of a separate lawsuit, in violation of its duty to preserve relevant emails in this case. (ECF No. 205 at 25).  Defendant states, however, that it has retained control of the forensic image of Perkins' work computer, that it searched this forensic image for relevant emails, and that it produced relevant emails in accordance with the ESI Protocol.  (ECF No. 218 at 45).  Defendant further argues that Perkins separated from the company in August of 2008, but that it searched for and located emails dating back to November of 2004.  Id.  Plaintiff points to no evidence to rebut defendant's representations, and merely relies on speculation that additional emails should have existed.  For the foregoing reasons, plaintiff has failed to meet its burden in establishing that defendant failed to preserve relevant emails that it had a duty to preserve.  Plaintiff's motion is denied as to these custodians.

### (5) Phillip Franzoni, Paul Green, Bogdan Lucyzk, and Jeff Williamson

Three of these individuals allegedly engaged in discriminatory behavior, while the last, Jeff Williamson, replaced Dan Peckskamp as Vice President of Operations after Peckskamp's resignation in January of 2009.  (ECF No. 205 at 19–20).  Defendant produced zero emails from Franzoni's email data, thirteen[33] from Green's email data, two emails from Lucyzk's email data, and seventeen from Williamson's email data.  (ECF No. 205 at 20).  Defendant had a duty to preserve all relevant emails from these accounts after August 7, 2008, when defendant was placed on notice of a pattern or practice claim, and all of these individuals were employed with the

---

[32] Plaintiff also notes that Perkins may have received emails regarding the initial CCF charges, which defendant had a duty to preserve after June 11, 2007.  (ECF No. 205 at 20).
[33] Plaintiff notes that "[a]ll 13 concern only the receipt of an employee handbook."  (ECF No. 205 at 20).

company after August 7, 2008. <u>Id.</u> Defendant has provided a sworn affidavit by counsel that it collected, searched, and produced relevant emails for these custodians. (ECF No. 218-2 at 5). Plaintiff fails to offer any evidence, that defendant did not preserve all relevant emails from these individuals, beyond a general argument that, because defendant's overall production was "meager," more emails must have existed. Absent further evidence that these custodians would have possessed any emails relevant to plaintiff's claims, this general argument is insufficient to establish that defendant destroyed relevant evidence that it had a duty to preserve. In sum, plaintiff has not met its burden of establishing that defendant failed to preserve relevant emails that it had a duty to preserve.[34] Plaintiff's motion is denied as to these custodians.

### (6) Donnie Miniard and Christopher Stacey

Donnie Miniard was a supervisor of transportation who allegedly engaged in discriminatory behavior, while Christopher Stacey worked as a warehouse manager during a time when Paul Green allegedly gave orders to another employee not to hire females. (ECF No. 205 at 19–20). Defendant has represented that it was unable to locate emails for either of these individuals. (ECF No. 205 at 21). Defendant had a duty to preserve all relevant emails from these accounts after August 7, 2008, when defendant was placed on notice of a pattern or practice claim, and these individuals were employed with the company after August 7, 2008. <u>Id.</u> Plaintiff argues that both individuals should have had relevant emails, but because none were produced, defendant has failed to preserve these emails. (ECF No. 205 at 44).

As to Donnie Miniard, defendant notes that "there are handwritten notes of a sexual harassment complaint against him." (ECF No. 218 at 40). Defendant argues, however, that plaintiff "presents no testimony or documentary evidence of any email communications by or to

---

[34] Additionally, as previously noted, it is possible that there may still be relevant emails on backup tapes that defendant did not sample. (ECF No. 218 at 39).

Miniard that concerned or indicated that he disfavored hiring female operatives and drivers, or that he was a key player in hiring decisions given his short tenure[35] in a supervisory role." Id. Defendant also notes that it searched the emails of Dana Shea, the person with the handwritten notes about Miniard, but "found no emails between her and Miniard or emails related to the hiring of women for operative positions." Id. at 40 n.86. Plaintiff's argument that Miniard should have possessed relevant emails is therefore speculative, and plaintiff has failed to meet its burden of establishing that defendant failed to preserve emails from Miniard's account that it had a duty to preserve.

As to Christopher Stacey, plaintiff argues that he may have relevant emails because he reported to Paul Green and because he was a hiring manager. (ECF No. 205 at 19). Defendant argues, however, that plaintiff has provided no evidence that Stacey would have relevant emails. Specifically, defendant notes that plaintiff deposed Green, but never asked Green about his interactions with Stacey, including whether they exchanged relevant emails. (ECF No. 218 at 42). Defendant also states that it has produced emails for Green and other managers at Stacey's OpCos, and that if relevant emails existed between those managers and Stacey, defendant would have produced them under the ESI Protocol. Id. Absent further evidence, plaintiff's argument that Stacey should have possessed relevant emails amounts to mere speculation, and plaintiff has not met its burden of showing that defendant failed to preserve relevant emails that it had a duty to preserve. For the foregoing reasons, plaintiff's motion is denied as to Miniard and Stacey.

### (7) Password-Protected Documents

In its discussion of the alleged spoliation of emails, plaintiff also briefly mentions that defendant reported identifying 3,326 password-protected documents that it could not open. (ECF

---

[35] Miniard was a Transportation Supervisor and Manager for the Somerset OpCo from December 2009 to December 2010. (ECF No. 218 at 40 n.86).

No. 205 at 23). Plaintiff further states that, "[g]iven that many of the custodians are current employees under [d]efendant's control . . . the [c]ourt must accept the representation and its implication that [d]efendant has not preserved the passwords to these files, rendering them inaccessible." Id. Plaintiff fails, however, to go into any greater detail regarding these documents, and therefore has not met its burden of establishing the relevance of these documents or defendant's duty to preserve the passwords to these documents.

### (8) Conclusion

For the foregoing reasons, plaintiff has not established that defendant has failed to preserve relevant emails from the accounts of any of the nineteen custodians identified by plaintiff in its motions papers. Specifically, plaintiff has failed to establish that such ESI "should have been preserved in the anticipation or conduct of litigation" and was "lost because [defendant] failed to take reasonable steps to preserve it" under Rule 37(e) or that defendant "destroyed or altered" ESI that it had control over and "had an obligation to preserve" under the first element of the Thompson analysis. Fed. R. Civ. P. 37(e); Thompson, 219 F.R.D. at 101. Accordingly, plaintiff's motion for sanctions for the spoliation of custodian emails is denied.

### ii. Internal Complaint Documents

Plaintiff also briefly argues that defendant has failed to produce documents related to internal complaints of gender hostility or discrimination, specifically, documents relating to anonymous employee complaints made through a third-party hotline. (ECF No. 205 at 24). Defendant offered an employee hotline, hosted by a third party, Danbee Investigations ("Danbee"), to take anonymous employee complaints. Id. For each complaint, Danbee would transcribe the call, create a one-page "report" detailing the time, date, and subject of the call, and prepare an entry in a spreadsheet summary of the number of calls during a specific period. (ECF No. 206-4

at 1–2).  From approximately 2006 to 2012, Vice President of Human Resources Nancy Rooke was defendant's point of contact to receive notice of Danbee calls.  (ECF No. 205 at 24 (citing ECF No. 206-5 at 2)).  Rooke reported these complaints to the regional human resources officer as well as the chief human resources office.  (ECF No. 206-5 at 3).  Rooke also created a spreadsheet with the details of all hotline calls, from which she created a log that periodically summarized the hotline calls.  (ECF No. 206-5 at 4–5).  Rooke also testified at her deposition that these documents were saved on her computer and that she never deleted any such documents.  (ECF No. 206-5 at 6–7).

Plaintiff argues that defendant has failed to produce all hotline detail documents, call transcriptions, and periodic summaries.  (ECF No. 205 at 24).  Defendant has produced three transcriptions and redacted summaries that only cover the periods of 6/15/05–5/4/06, 6/16/06–9/13/06, 2/1/07–4/30/07, and the fourth quarter of 2012.  Id. (citing ECF No. 206-6)).  Defendant argues that plaintiff has provided no evidence that more documents should have been produced.  Specifically, defendant argues, Rooke never testified at her deposition as to how frequently she updated this log, and that she stated that she did not delete any documents and was aware of legal holds that required her to preserve such documents.  (ECF No. 218 at 46 (citing ECF No. 206-5 at 6–7).  Defendant further argues that these documents are not relevant to the case, as the hotline was only available to employees, and the claims in this case concern the hiring of external applicants.  (ECF No. 218 at 46).

This court has previously ruled that defendant was required to produce documents related to internal complaints of gender hostility or discrimination.  (ECF No. 65 at 3).  Defendant was placed on notice of a pattern or practice claim on August 7, 2008.  Accordingly, defendant had a duty to preserve evidence regarding relevant internal employee complaints, including call

transcriptions, hotline detail documents, and hotline summaries, after August 7, 2008. See Thompson, 219 F.R.D. at 101. Defendant has failed, however, to produce any documents from this time period, save for one hotline summary that covered the fourth quarter of 2012. Rooke has testified that, during this time period, she received notice of Danbee calls and recorded the details of all complaints. (ECF No. 206-5 at 2–5). It is also notable that defendant was able to produce redacted summaries that covered time periods in 2006, 2007, and 2012, but had no such summaries for the years 2008 to 2011. Plaintiff also notes that a human resource officer stated in an email in 2012 that there was "an excess of Hotline Calls," that an HR goal in 2014 was "[r]eduction of Danbee calls/issues," and that Danbee's logs for 2004 to 2009 showed 39 calls classified as complaints of "harassment" or "discrimination." (ECF No. 205 at 24 (citing ECF Nos. 206-7, 206-8, and 206-9)). Accordingly, it appears that additional ESI should have existed regarding internal employee complaints, specifically, call transcriptions, hotline detail documents, and hotline summaries after August 7, 2008, and that defendant has failed to preserve such evidence.

The parties have failed, however, to provide sufficient information regarding the remaining elements under both the Thompson and Rule 37(e) analyses. As to the requisite level of culpability, plaintiff largely reiterates its argument that defendant failed to properly institute safeguards to ensure preservation of relevant documents (ECF No. 205 at 32), which suggests that defendant may have negligently failed to preserve such documents. Plaintiff largely focuses its arguments on the alleged spoliation of custodian emails, however, rather than the missing internal complaint documents. As to relevance and prejudice, while it appears that the missing documents would likely be relevant to plaintiff's pattern or practice claim, I note that the hotline was used for "anonymous employee complaints," (ECF No. 205 at 24), which undoubtedly encompasses more than just complaints of gender hostility or discrimination. Additionally, plaintiff does not specify

how it would have utilized these documents to present its case or how it is therefore prejudiced by the lack of such information. Nonetheless, I find that it is not necessary to reach a conclusion as to these remaining elements under either the Thompson analysis or Rule 37(e), because, as discussed below, the only sanction sought by plaintiff is inappropriate for my review at this time.

### C. Sanctions

Based on the foregoing analysis, plaintiff has only established that defendant failed to preserve internal complaint documents, specifically, call transcriptions, hotline detail documents, and hotline summaries after August 7, 2008. Plaintiff requests that, as a sanction for the spoliation of these documents, the court preclude defendant from introducing any employee hotline transcripts or internal summaries into evidence. (ECF No. 205 at 43). Plaintiff similarly requests that the court preclude defendant from mentioning the existence of its employee hotline "in defense of alleged good faith or other affirmative defenses." Id. Defendant argues that plaintiff has failed to offer any authority for the "harsh sanction" of precluding defendant from offering these documents into evidence or from mentioning the hotline in its defense. (ECF No. 218 at 65–66).

As noted by defendant, plaintiff does not provide any legal support for this blanket preclusion of evidence and its applicability to this case. Moreover, I find that this request is premature, as it raises evidentiary issues that should be addressed in a pretrial motion in limine or as an objection to the proffered evidence at trial. Further factual development, particularly as to the remaining Thompson/Rule 37(e) factors, will be necessary to resolving such evidentiary issues. Accordingly, this request is denied without prejudice, as it is premature. The wholesale preclusion of the evidence at issue, as requested by plaintiff, is not warranted at this stage of the proceedings. These issues are more appropriately addressed by the trial judge at a later juncture.

Additionally, plaintiff requests generally that, if any of the spoliated evidence is later discovered, it be allowed 60 days to redesignate Phase I claimants, take depositions, and supplement its expert reports. (ECF No. 205 at 45). This request is also denied, without prejudice, as it is premature at this time. If any of the spoliated evidence is later discovered, plaintiff may raise this issue to be addressed by the court at that time.

**IV.    Conclusion**

For the foregoing reasons, plaintiff's motions (ECF Nos. 203, 205) are DENIED. A separate order will be issued.


March 6, 2019                              _____/s/_____
                                          Beth P. Gesner
                                          Chief United States Magistrate Judge