**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Equal Employment Opportunity** | * | |
| **Commission** | * | **Civil Action No. 13-1712** |
| **v.** | * | |
| | * | |
| **Performance Food Group, Inc.** | * | |

**MEMORANDUM**

The Equal Employment Opportunity Commission ("EEOC") alleges that Performance Food Group, Inc. ("PFG") has engaged in a pattern or practice of gender discrimination in its selection of operative positions in its warehouses and discriminated against Julie Lawrence on the basis of her sex when it did not promote her to a training supervisor position. Now pending are the EEOC's motion for summary judgment and PFG's cross motion for summary judgment. The motions have been fully briefed and no oral argument is necessary. For the reasons stated below, both motions will be denied.

**FACTS**

## I. PFG's Operations

PFG is a foodservice distributor which delivers food products to restaurants, schools, hotels, health care facilities, and other institutions. (ECF 236-1, EEOC's Statement of Facts ("SOF") ¶ 1; ECF 281-1, PFG's Responses to the SOF ¶ 1). This case centers around approximately 20 distribution centers (also known as operating companies, or "OpCos") managed by the Broadline Division[1] of PFG, located across the United States, and employing approximately 7,000 employees. (SOF ¶ 2; PFG's Responses ¶ 2). The OpCos are each wholly owned subsidiaries of PFG. (ECF 267-37, PFG Ex. 137, Latour[2] Decl. ¶ 10; ECF 267-29, PFG

---

[1] Also referred to as Performance Foodservice or "PFS."
[2] M. Latour was the vice president of human resources at the Caro and Florida OpCos. (*Id.* ¶¶ 5–6).

Ex. 129, Stacharowski[3] Decl. ¶ 4).  There are three levels of management: at the OpCo, at the regional, and at the corporate level.  Each OpCo has its own president, chief financial officer, vice president of operations, and vice president of human resources, who report to their respective regional managers.  (SOF ¶ 3; PFG's Responses ¶ 3).  It appears the regional managers report to their respective corporate officials.  For example, Broadline's regional vice presidents of operations reported to PFG's corporate vice president of operations, who oversaw all of Broadline's operations.  (*Id.*).

## II.     Hiring Process

When an OpCo needs to hire additional operatives, the relevant supervisor or manager requests that a job opening be posted. (ECF 288-35, EEOC Ex. 628, J. Long Depo. at 156:7–10).  PFG accepted paper applications for a substantial portion of 2004–2009, but started accepting online applications, managed by the Virtual Edge system, beginning in 2009.  (ECF 233-1, Elvira Sisolak Expert Report at 3; Stacharowski Decl. ¶¶ 28–29).  Candidates first complete a candidate profile, and then complete an online application.  (Sisolak Report at 3).  Applicants are initially screened by the OpCos' human resources employees, who then send applicants that meet qualifications to the hiring supervisor or manager.  The hiring supervisor or manager selects candidates to interview and then chooses whom to hire.  (ECF 288-34, EEOC Ex. 627, Recruitment and Selection policy; ECF 271-6, PFG Ex. 26, Wheat[4] Decl. ¶¶ 24–27. *But see* Stacharowski Decl. ¶¶ 30–31 (CCF's vice president of human resources stated he screens to see if applications are complete, but hiring manager screens for minimum qualifications)).

It appears that regional managers sometimes help out with hiring at local OpCos if needed.  For example, if local human resources employees are not available, the regional vice

---

[3] S. Stacharowski was vice president of human resources of the Carroll County Food (CCF) OpCo.  (*Id.* ¶ 1).
[4] J. Wheat is the vice president of operations at the Hale OpCo.  (*Id.* ¶ 2).

president of human resources will sometimes screen applicants. (SOF ¶ 12; PFG's Responses ¶ 12). And on occasion, regional vice presidents of operations could be involved in the interviewing and hiring of OpCo level officials, including warehouse managers. (SOF ¶ 27; PFG's Responses ¶ 27). The local managers and supervisors who made hiring decisions between 2004–2013 were mostly male. (ECF 237-17, EEOC Ex. 57, roster of supervisors with hiring authority). During the time period at issue, no operations employee above the level of local manager was female. (ECF 337-18, EEOC Ex. 58, full supervisor and executive roster).[5]

Policies regarding hiring, recruiting, equal employment opportunity, discrimination and harassment were created and disseminated by corporate human resources for the OpCos to use as guidelines. (SOF ¶ 6; PFG's Responses ¶ 6). Corporate human resources also disseminated job descriptions for certain operative positions at the OpCos, which could be supplemented by the local OpCos. (SOF ¶ 8; PFG's Responses ¶ 8). Certain individuals in OpCo human resources have been responsible for training hiring managers and supervisors on hiring practices and policies. (SOF ¶ 7; PFG's Responses ¶ 7).

### III. Job Positions

The jobs at issue in this litigation are operative positions at PFG's Broadline Division. "Operatives" are defined by the EEOC as "[w]orkers who operate machine or processing equipment or perform other factory-type duties of intermediate skill level which can be mastered in a few weeks and require only limited training."[6] The specific job titles at issue in this litigation are: (1) truck drivers; (2) selectors; (3) forklift operators; (4) transportation or

---

[5] The rosters provided by the EEOC do not include gender, but the EEOC represented in its statement of facts that the hiring officials were mostly male, and no operations employees about the level of local manager was female, citing to the rosters. (SOF ¶ 59). PFG disputes these facts (PFG Responses ¶ 59) but provides no explanation as to why it disputes them.

[6] Job Patterns for Minorities and Women in Private Industry: A Glossary, https://www.eeoc.gov/eeoc/statistics/employment/jobpat-eeo1/glossary.cfm (last accessed March 11, 2020).

warehouse supervisors; and (5) an "other warehouse" category of miscellaneous nonselector warehouse jobs.[7]

The selector position is an entry level position, and selectors are responsible for selecting product from slots in the warehouse to fill the customer's order. (ECF 270-7, PFG Ex. 267, Burns[8] Decl. ¶ 9). It is a physically demanding job, and selectors work from the evening to the early morning. (*Id.*). The general minimum qualifications for the selector position are a high school diploma or GED and some previous warehouse experience, but it appears the criteria varied by OpCo and time period. (Burns Decl. ¶ 10 (minimum qualifications at Springfield); SOF ¶ 58; PFG's Responses ¶ 58 (criteria varied)). PFG would sometimes hire individuals who did not meet minimum qualifications when there were few people in the pool of applicants with experience and they needed to fill a position. (Burns Decl. ¶ 12). The selector position has a high turnover rate. (*Id.*).

Drivers deliver the products to the customers. (*Id.* ¶ 13). They drive tractor-trailers, and the minimum qualifications are generally a CDL Class A license, CDL A driving experience, and a high school diploma or GED, although, as with the selector position, the requirements may vary. (*Id.* ¶¶ 13, 14). The driver position also requires heavy lifting. (*Id.* ¶ 13).

At least for the time period at issue, PFG generally required some experience for the forklift and supervisor applicants. (Sisolak Report at 9). The "Other Warehouse" category included mainly daytime jobs such as lumper, loader, receiver, and driver helper. (*Id.*).

## IV.    Statistics

---

[7] It appears that PFG had more job titles, but the titles were grouped into these five positions for the purposes of this litigation. (Sisolak Report at 2).
[8] P. Burns is the regional vice president of field human resources for PFS, and was previously vice president of human resources at PFS Springfield. (Burns Decl. ¶ 1). She was PFG's 30(b)(6) deponent, but also provided a declaration, cited here, as part of PFG's cross motion for summary judgment and opposition to the EEOC's motion for summary judgment.

### a. Statistical Analyses

The disputes between the EEOC's expert, Elvira Sisolak, and PFG's expert, Stephen Bronars, are more fully discussed in the court's memorandum opinion on the motions to exclude. In brief, Sisolak examined the selection rate of women as compared to men among the five operative positions for the period 2004–June 30, 2009, and July 1, 2009–2013.[9] Sisolak used the Cochran-Mantel-Haenszel procedure ("CMH") to compare the selection rates, performing tests to control for job group, location, year, and (for the 2009–2013 period) job tracking number. (Sisolak Report at 13–14 (2009–2013); 23 (2004–2009)). Sisolak conducted other statistical tests to measure the disparity between male and female selection rates controlling for experience, for online application, and, for drivers, whether the applicant had a Class A license.[10] (Id. at 14–16, 23–24). The disparity in offer rates between male and female applicants was statistically significant in each test conducted.[11] (Id.).

PFG's expert, Stephen Bronars, argues that Sisolak's results are not valid because of methodological failures. He generally argues that Sisolak artificially combined candidates that were not actually competing against each other in statistical pools; inappropriately aggregated test results across job groups, OpCos, and years; should have used multiple regression analysis instead of CMH; and failed to properly control for the experience of candidates. (ECF 233-3, Bronars Expert Rebuttal Report). Bronars conducted his own CMH analysis "for each of 81 combinations of job groups and OpCos that had at least one 'competitive' requisition [male and female candidates and at least one offer] in 2009–2013 using job requisitions as strata." (ECF

___

[9] Sisolak divided the data between the two time periods because the latter time period has more complete data.

[10] For the 2004–2009 period, there was not enough data on prior experience to control for it in the forklift and supervisor groups.

[11] Social scientists consider any probability smaller than .05 (i.e., a 5% probability that the disparity could have occurred by chance) to be statistically significant. Statistical significance can also be expressed in terms of "standard deviations" where a result of two or more standard deviations is statistically significant. (Sisolak Report at 10 n.16).

233-5, Bronars Supplemental Report at 3). He also conducted a multiple regression analysis, accounting for job requisition and using Sisolak's controls for prior experience. (*Id.* at 6). Applying both methods, he found no significant differences in job offer rates adverse to female applicants for forklift operators, warehouse supervisors, or other miscellaneous warehouse positions at any OpCo, (*id.* at 3–4, 6–7), and in the multiple regression analysis, found no statistically significant differences in job offer rates for drivers at any OpCo, (*id.* at 6). He did, however, find statistically significant differences in job offer rates adverse to female selector applicants in 15 (using CMH) and 14 (using multiple regression) of the OpCos. (*Id.* at 3–4, 7).

Sisolak submitted a supplemental rebuttal, arguing that Bronars had divided the data into unreasonably small groups so that results could never be statistically significant; for example, he calculated no statistically significant disparities in 44 location/job groups that had female applicants but zero female hires. (ECF 233-6, Sisolak Supplemental Rebuttal at 5–7). Sisolak used the test that Bronars used, OLS regression analysis, but aggregated the results based on position and for all jobs combined, finding that gender disparities in selection rates were statistically significant for the driver, selector, and the other warehouse job groups, as well as for all jobs combined. (*Id.* at 17). Selection rates for women applying to the forklift and supervisor positions were lower than for men, but the difference was not statistically significant. (*Id.*).

### b. Descriptive statistics

Sisolak provides descriptive statistics that PFG does not appear to dispute,[12] including statistics showing that some OpCos during either the 2004–2009 period or 2009–2013 period made zero offers to either female selector applicants or female driver applicants.[13] The EEOC

---

[12] In PFG's responses to the EEOC's statement of facts, PFG generally disputes the "validity, accuracy, and relevance" of these figures. It is not clear what evidence PFG relies upon to dispute these figures.
[13] *E.g.* PFG hired zero female selector applicants at four of the OpCos during the 2004–2009 period. (Sisolak Report, Ex. 4).

also notes a number of "preselected applicants," where a job requisition appears to have been opened for one person to apply, and that person was hired shortly after applying, sometimes the same day. (ECF 236-31, EEOC Ex. 29, Second Decl. of J. Bannon, Assistant General Counsel for Expert Services, Office of General Counsel, EEOC ¶ 5). Most of these "preselected applicants" were male. (*Id.*). The EEOC and PFG disagree as to how these non-competitive requisitions occurred, and whether they were actually "non-competitive" (*e.g.* PFG argues that in some instances these requisitions were created to hire additional individuals that had previously applied to a "competitive" requisition, or to convert a temporary employee to a permanent position). (ECF 267-34, PFG Ex. 134, DeYoung-Yankowskas[14] Decl. ¶¶ 50–52 (additional individuals); ECF 236-32, EEOC Ex. 30, Burns Depo. at 7:11–8:2; ECF 267-30, PFG Ex. 130, Cantu[15] Decl. ¶¶ 25–26 (temporary to permanent employee)).

## V.     Other evidence

Both the EEOC and PFG submit numerous documents, as well as testimony from many individuals, in support of their motions. These include emails, work documents, deposition transcripts, and declarations. The EEOC's evidence generally consists of testimony of applicants[16] regarding discriminatory comments made during their interview and (if they were hired) during their employment; testimony of some supervisors at PFG regarding discriminatory comments made by other supervisors; inappropriate emails regarding women (e.g., emails disparaging women drivers); and some emails or documents indicating that PFG was looking for men to fill the warehouse positions. PFG's evidence generally consists of numerous declarations from managers at PFG regarding PFG's operations, local control of hiring, and disputing that

---

[14] J. DeYoung-Yankowskas is vice president of human resources at the PFS Miltons OpCo. (*Id.* ¶ 2).
[15] C. Cantu was vice president of human resources at the PFS Victoria OpCo. (*Id.* ¶ 2).
[16] As discussed in the court's memorandum on the motion to strike, the court does not consider the testimony of certain class members who were not designated by the EEOC. *See* note 17, *infra*.

supervisors made discriminatory comments; evidence that employees who made discriminatory comments were disciplined; and emails regarding efforts to hire more women and develop affirmative action plans. The EEOC also discusses the 40 designated Phase I class members,[17] arguing that they were not selected even though they were more qualified than other male candidates that were hired, which PFG disputes.[18]

## VI. Julie Lawrence

Julie Lawrence was hired in November 2006 as a night shift selector at the CCF OpCo. (SOF ¶ 138; PFG's Responses ¶ 138). She reported directly to night warehouse supervisor Kyle Gardner. (*Id.*). Lawrence also worked with warehouse manager Jason Geib. (ECF 239-28, EEOC Ex. 148, Lawrence Depo. at 49:12–17).

In February 2007, PFG advertised internally and externally for a night warehouse training supervisor position at CCF. The job required: four to five years in a warehouse setting and a minimum of one year of foodservice related experience, with a college degree preferred but not required. (SOF ¶ 135; PFG's Responses ¶ 135). CCF VP of operations Jeff Wismans created the position with CCF VP of human resources Steve Stacharowski, and they reviewed the applicants. (ECF 239-26, EEOC Ex. 146, Wismans Depo. at 141:6–11). At the time of the posting, Lawrence had graduated from college and had worked for PFG for three months as a selector; she had also worked for UPS as a training supervisor for one and a half years; and had worked as an area sales manager and sales representative for approximately six years. (SOF ¶

---

[17] This case is bifurcated into two phases. Phase One, which the case is currently in, is intended to resolve the EEOC's pattern or practice claim and all issues pertaining to the claim made on behalf of Julie Lawrence. (ECF 37, Memorandum and Order Re: Bifurcation 12–13). If necessary, the case will then proceed to Phase Two to resolve the specific individual claims. (*Id.* at 13). The first procedural order (ECF 39) allowed PFG to designate 40 class members whose testimony may be presented in the Phase One trial.

[18] The court discusses the 40 designated class members for the purpose of assessing the EEOC's pattern or practice claim. The court will not decide the merits of the individual cases at this time, as discussed *infra*.

139; PFG's responses ¶ 139).  Geib urged Lawrence to apply for the position.  (SOF ¶ 137; PFG's Responses ¶ 137).

PFG policy states that internal applicants "must have been in your current position for a minimum of six (6) months" to be eligible to apply for a promotion.  (ECF 239-34, EEOC Ex. 154, Promotion Policy).  The six month requirement, however, could be waived by management for business necessity.  (*Id.*; *see also* ECF 239-30, EEOC Ex. 150, Job Posting Policy ("All PFG associates with six or more months of continuous Company service, and/or have been in their current position for a minimum of six months . . . are eligible to apply for posted openings. Exceptions of the six (6) month continuous service need to have OpCo president/General Manager approval.")).

In the last few weeks of January, Geib introduced Lawrence to Dave Russ, a regional vice president of operations, and either told him she had applied for the supervisor position, (ECF 266-50, PFG Ex. 100, Geib Depo. at 74:23–75:15), or told him that Lawrence had the aptitude for a potential position as a supervisor, (ECF 267-4, PFG Ex. 104, Russ Depo. at 54:14– 22).  On February 28, 2007, Lawrence submitted a cover letter and resume to Geib.  (SOF ¶ 142; PFG's Responses ¶ 142).  It does not appear that Lawrence ever completed an internal application form for the position.  Wismans and Stacharowski decided to hire Lester Quinteros, who is male, for the warehouse supervisor/trainer position.  (SOF ¶ 146; PFG's Responses ¶ 146).  Quinteros had worked as a warehouse trainer from October 2005–November 2006, as a production supervisor from May 2004–October 2005, and as a supervisor at a seafood and produce company for two years before that.  (ECF 240-4, EEOC Ex. 164, Quinteros Application).

The parties dispute whether Geib ever forwarded Lawrence's resume and cover letter to the decisionmakers, whether Lawrence submitted an application, and whether Dave Russ was a decisionmaker and whether he made discriminatory comments about Lawrence. Geib states that Lawrence told him she applied, (ECF 237-21, EEOC Ex. 61, Geib Depo. at 52:16–22), and that he spoke with Stacharwoski about her application and gave her resume to Dave Russ. (*Id.* at 40:5–8; 53:2–11; 61:25–67:22; 80:22–25). According to Geib, Russ stated that, based on corporate vice president of operations Dan Peckskamp's comments in the past (that if CCF wanted to improve, they needed to stop hiring women in the warehouse, *id.* at 127: 11–19), PFG could not continue to put women in the warehouse positions. (*Id.* at 65:18–20).

Kyle Gardner also testified during his deposition that Lawrence had mentioned to him that she applied for the position. (ECF 237-26, EEOC Ex. 66, Gardner Depo. at 104:12–15). Gardner stated he also brought up Lawrence's interest in the position to Jeff Wismans and Dave Russ while they were in the front conference room discussing another matter. (*Id.* at 107:1–108:7). He also testified about a meeting where Geib made Russ aware of Lawrence's interest, and gave Russ a resume that Gardner believed was Lawrence's, and Russ said "he wasn't interested in seeing nothing from a woman." (*Id.* at 110:9–11, 251:6–21). According to Lawrence, she spoke with Gardner at some point regarding her application and Gardner said that he was in a meeting and whoever was handed Lawrence's resume said "no one is interested in seeing anything from a woman." (EEOC Ex. 148, Lawrence Depo. at 84:21–25).

PFG argues that the alleged conversation between Geib and Russ could not have happened. It appears that the meeting occurred after February 28, 2007, when Lawrence gave Geib her resume and cover letter. After that date, however, according to swipe card records reported in Stacharowski's declaration, Geib worked one hour in the morning on March 1, 2007,

and did not report to work on March 2, 2007.  (PFG Ex. 129, Stacharowski Decl. ¶ 68).  On March 3, 2007, Geib left for Oklahoma and never returned to CCF before he was terminated on March 19, 2017.  (ECF 266-50, PFG Ex. 100, Geib Depo. at 119:18–120:2).  PFG claims that Lawrence could not have seen Geib Thursday morning because she worked the night shift.[19] Further, according to Russ, during the last week of February 2007, he was at Elizabeth, New Jersey, and could not have spoken with Geib about Lawrence's application as Geib described. (ECF 272-1, PFG Ex. 279, Russ Decl. ¶ 29).[20]  PFG also provides an Expedia booking showing flight reservations for February 26 and March 2, 2007; a car reservation from February 26 to March 2, 2007; and a hotel reservation from February 26, 2007 to March 2, 2007, as well as an expense report for the week of February 26.  (ECF 293-28, PFG Ex. 371).

The parties also dispute whether Geib was qualified.  PFG argues that Geib was not qualified because she did not submit an internal application and she was not at her position for six months.  It appears that at some other OpCos there was no need for internal applicants to submit an application, and they just needed to express interest, but PFG objects as there is no indication this was the case at CCF.  (SOF ¶ 142; PFG's Responses ¶ 142).[21]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party*

---

[19] PFG cites to Lawrence's deposition (Cross Motion at 143) but the page it cites to was not included in the exhibit.

[20] Russ's declaration cites to "Exhibit S" for this assertion.  It is not clear what "Exhibit S" is or whether it is in the record.

[21] The EEOC cites to Gardner's deposition to support its assertion that Lawrence was promoted from picker to forklift operator without six months of continuous service, however the page they cite to was not included in the exhibit.  (Opposition/Reply at 142).

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"  *Anderson*, 477 U.S. at 247–48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## DISCUSSION

### I.      Pattern or Practice

Title VII prohibits an employer from failing "to hire . . . any individual . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).[22]  The EEOC bears the initial burden of making out a prima facie case of discrimination.  It must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" but instead must "establish by a preponderance of the evidence that [sex] discrimination was the company's standard operating

---

[22] Enforcement actions may be brought by the EEOC pursuant to § 706 of Title VII, 42 U.S.C. § 2000e-5, and § 707, 42 U.S.C. § 2000e-6.  The parties previously disputed whether a pattern or practice claim could be brought under § 706.  *See E.E.O.C. v. Performance Food Group*, 16 F. Supp. 3d 584, 589 (D. Md. 2014).  Relying on *Serrano v. Cintas Corp.*, 699 F.3d 884, 894–96 (6th Cir. 2012), the court declined to dismiss the EEOC's § 706 claim, but noted that the court would reconsider its holding prior to commencement of Phase 2 (determination of individual cases) if circumstances warrant.  *Performance Food Group*, 16 F. Supp. 3d at 590; *see also E.E.O.C. v. Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d 90, 107–09 (S.D.N.Y. 2015) (relying in part on *Serrano* to find that the EEOC could bring a pattern or practice claim under § 706).

procedure — the regular rather than the unusual practice." *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 336 (1977). "This prima facie showing may in a proper case be made out by statistics alone, or by a cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination." *E.E.O.C. v. LA Weight Loss*, 509 F. Supp. 2d 527, 533 (D. Md. 2007) (quoting *E.E.O.C. v. Am. Nat. Bank*, 652 F.2d 1176, 1188 (4th Cir.1981)). "If a prima facie case is established by the EEOC, the burden shifts to the employer to rebut the inference of a pattern or practice of disparate treatment." *Id.*

The EEOC clearly has made out a prima facie case with respect to its pattern or practice claim. The EEOC's statistical analysis shows statistically significant disparities in the hiring of male and female applicants, adverse to female applicants, across operative positions and OpCos, even when controlling for experience. It has presented other statistical evidence showing that some OpCos hired no female applicants in certain positions for the entire period 2004–2009 or 2009–2013.

Further, the EEOC provides other evidence that supports its statistical showing. For example, a media recruitment plan circulated in December 2006 and January 2007 identified the target demographic for radio ads for drivers and warehouse workers as "male." (ECF 237-19, EEOC Ex. 59, PFG Recruitment Media Planning Overview). Job order forms from 2011 submitted to a staffing agency indicate that the Victoria OpCo sought males for warehouse positions and females for a receptionist position. (ECF 239-20, EEOC Ex. 140, Job Order Forms). Other emails presented by the EEOC include a 2014 email indicating reluctance to interview a female applicant for a helper position because it was not a good idea to put a female in a truck with "these guys,"; a 2010 email from Little Rock's transportation manager implying that a female applicant for a driver position was not hired because one of the interviewers took

too long to interview her (presumably, that he enjoyed interviewing her too much); and emails joking that women are bad drivers. (ECF 238-13, EEOC Ex. 93, Email chain between H. Griffin and J. Long; ECF 238-35, EEOC Ex. 115, April 6, 2010, email re driver interviews; *e.g.* ECF 238-9, EEOC Ex. 89, Email from T. George titled "Top 10 Women Drivers of the Year").

There are numerous genuine disputes of material fact with respect to the 40 Phase I claimants. These include disputes about the relative qualifications of the candidates, whether PFG held women to stricter criteria than male candidates, and whether PFG has provided shifting rationales for its nonselection decisions. Still, the circumstances of the nonselection of the Phase I claimants provide support for the EEOC's pattern or practice claim, and this evidence, along with the other statistical and anecdotal evidence, must be weighed by the jury.

As discussed above, there remain genuine disputes regarding the statistical and other evidence. Importantly, there remain genuine disputes of material fact as to whether the statistical tests conducted by Sisolak, showing gender disparities in hiring for the five operative positions between 2004–2013, are valid, particularly for the driver, forklift operator, warehouse supervisor, and other warehouse positions. Because the EEOC must prove a regular practice of discriminatory hiring, statistical evidence is important. *See Equal Employment Opportunity Comm'n v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 169 (D. Mass. 2016) ("statistics are generally considered central to pattern-or-practice cases" but "context and circumstances determine the evidentiary weight that the statistics provide."). Therefore, the court will not grant summary judgment for either party, as there are genuine disputes of material fact regarding the statistical analysis as well as the EEOC's anecdotal evidence, including the alleged discriminatory comments made by PFG managers.

The selector position presents a closer question, but the court finds that PFG has also met its burden of production under the *Teamsters* framework, making summary judgment for the EEOC inappropriate.[23] *See Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d at 110. PFG rebuts the EEOC's prima facie case through "alternative statistical analysis, an attack on the probative value of the EEOC's statistical analysis, and various challenges to the anecdotal evidence." *Id.* at 113. Even Bronars' own statistical analysis, however, shows a statistically significant disparity in offer rates adverse to female selector applicants between 2009–2013 in 14 of the 23 OpCos that had at least one competitive requisition. (Bronars Supplemental Report at 7).[24] Additionally, of the OpCos in which he found that disparities were not statistically significant, three had zero female selector hires between 2009–2013, and all had a lower selection rate for female selector applicants than for males. (Sisolak Supplemental Rebuttal at 7, 10). At least for the three OpCos with zero female hires, this indicates that there was not enough statistical power to find significance even with the lowest possible numbers of female hires.

PFG argues that "[a]ssuming for the purpose of this motion that this statistical evidence establishes a prima facie case with respect to hiring of females for selector positions, PFG is still entitled to summary judgment" because the anecdotal evidence shows that "any disparity is the result of the lack of qualified female applicants who want to be selectors." (Cross Motion at 15). Specifically, PFG argues that the difficult nature of the selector job makes it hard to recruit women, and women often drop out of the process once they realize how difficult the job is, citing to declarations of various managers. (*E.g.,* PFG Ex. 129, Stacharowski Decl. ¶¶ 18–20).[25]

---

[23] Summary judgment for PFG is inappropriate because genuine disputes of material fact remain with respect to PFG's rebuttal of the EEOC's prima facie case.

[24] Bronars still used Sisolak's experience controls (categorization of applicants by experience), which he criticizes. Further, Bronars only performed his statistical analysis on the 2009–2013 period, as PFG did not use job requisition numbers, which he relies on, between 2004–2009.

[25] Other declarations cited to by PFG state that both men and women withdraw because of the difficulty of the position. (*E.g.,* ECF 269-58, Ex. 258, L. Roseboro Decl. ¶ 24).

The first argument, that the disparity is due to the difficulty recruiting women, is unpersuasive, as Sisolak (and Bronars) examined disparities in job offer rates based on the number of women that actually applied. Therefore, any difficulty in recruiting women would be reflected in the lower number of female applicants, which is taken into account in the statistical analyses. The second argument, that women drop out of the process once they realize how difficult the job is, is similarly unpersuasive. It appears, rather, that between 2004 and 2013, women generally withdrew their applications for the selector position (and all positions) at a lower rate than men. (ECF 288-2, EEOC Ex. 595, Fourth Decl. of J. Bannon, Attachments A–G). To the extent that the managers believe that women are more likely to drop out of the process, that assertion is contradicted by the statistics. Further, PFG has not rebutted the statistical evidence that female selector applicants withdrew at a lower rate than male selector applicants. Therefore, women dropping out of the process does not appear to explain the disparity in selection rates for the selector position. PFG also argues that the EEOC has not shown intentional discrimination, as PFG made attempts to hire women. This, however, does not negate the statistical showing that women were hired at lower rates than men for the selector position, and that the disparity was statistically significant.

Mindful, though, that PFG at this stage bears only the burden of production, *see U.S. v. City of New York*, 717 F.3d 72, 84–85 (2d Cir. 2013), the court will not grant the EEOC's motion for summary judgment as to selectors. There remains a genuine question of how to account for the nine OpCos in which Bronars did not find statistically significant disparities in hiring rates. Additionally, Bronars' statistical analysis used Sisolak's controls for experience, which Bronars has criticized for being incomplete. Therefore, the court cannot find at this time that no reasonable jury could return a verdict for PFG as to the selector position. Further, because

summary judgment cannot be granted for either party as to the other operative positions, this case must proceed to trial in any event.

Because the court does not decide the pattern or practice liability, it will also decline to decide liability in the individual cases of the 40 designated Phase One class members. *See U.S. v. Gregory*, 871 F.2d 1239, 1241 n.6 (4th Cir. 1989) ("Once the pattern or practice has been proved, an inference is raised that all employment decisions . . . were made in pursuit of the policy. The burden shifts to the employer to provide a lawful reason for denying employment to the class members."); *Serrano v. Cintas Corp.*, 699 F.3d 884, 893 (6th Cir. 2012) (*Teamsters* framework "charges the plaintiff with the higher initial burden" of establishing the pattern or practice, but once a pattern or practice is shown, individual plaintiffs have a lower burden than in the *McDonnell Douglass* framework to make out a prima facie case).

## II.    Julie Lawrence

A plaintiff may establish a claim of discrimination by presenting either direct or circumstantial evidence or proceeding through the "pretext" burden shifting framework. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004). In the first method, the plaintiff must present sufficient evidence, direct[26] or circumstantial, for a reasonable jury to conclude by a preponderance of the evidence that an impermissible basis (such as sex) was a motivating factor for the employment decision. *Id.* at 285 (citation omitted). Using the "pretext" framework, the plaintiff "after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* at 285. The elements of a prima facie case for

---

[26] "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.' *U.S. EEOC. v. CTI Glob. Sols., Inc.*, 815 F. Supp. 2d 897, 906 (D. Md. 2011) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).

failure to promote are: (1) the plaintiff is a member of a protected group; (2) she applied to the position in question; (3) she was qualified for that position; and (4) she was rejected under circumstances that give rise to an inference of discrimination. *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 544–45 (4th Cir. 2003). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason. *Hill*, 354 F.3d at 285. If the employer's burden is met, the plaintiff must then prove that the employer's reasons are pretext for discrimination. *Id.*

"Title VII and the ADEA do not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer." *Id.* at 290. Other individuals may be treated as decisionmakers provided they "possessed such authority as to be viewed as the one principally responsible for the decision." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 411 (4th Cir. 2013) (quoting *Hill*, 354 F.3d at 291).

The EEOC proceeds under both the direct evidence and pretext framework. PFG argues that it is entitled to summary judgment, because Lawrence never applied to the training supervisor position, Geib's alleged conversations with Stacharowski and Russ cannot have occurred, there is no evidence that Wismans or Stacharowski had discriminatory animus against Lawrence, and Lawrence was not qualified for the position as she had not been at PFG for six months. Because there remain genuine disputes of material fact regarding all of the above, the court will deny summary judgment for both parties.

First, there is conflicting testimony as to whether Geib forwarded Lawrence's resume and cover letter to the decisionmakers and whether Stacharowski, Wismans, or Russ knew that Lawrence applied to the supervisor position. Geib testified that he spoke with Stacharowski about Lawrence's candidacy, and both Gardner and Geib testified that Geib gave Lawrence's

resume to Russ and Russ stated that he would not consider Lawrence for the position because of her sex.[27] PFG argues that Geib and Gardner's testimony that Geib gave Lawrence's resume to Russ and Russ made discriminatory comments cannot be true because, after Lawrence gave Geib her resume on February 28, Geib only went to work one day (on March 1) and Russ was in New Jersey until March 2. As support, PFG presents a declaration from Stacharowski about Geib's swipes into the facility, Russ's declaration about being in New Jersey, and flight bookings indicating that Russ flew to Newark on February 26, 2007, and flew from Newark to Minneapolis on March 2, 2007.

"Where a witness's deposition testimony 'is blatantly contradicted by the record, so that no reasonable jury could believe it,' an alleged factual dispute created by the testimony need not be credited and 'will not defeat an otherwise properly supported motion for summary judgment.'" *Hodges v. Fed.-Mogul Corp.*, 621 F. App'x 735, 741 (4th Cir. 2015)[28] (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Here, the court cannot find that Geib and Gardner's testimony is so blatantly contradicted by the record that no reasonable jury could believe it. First, PFG has not presented the swipe card records, and even if they had, Geib might have entered the facility without swiping in, if the door was already open. (EEOC Ex. 645, Geib Decl. ¶¶ 9, 10). Second, although the flight bookings indicate that Russ was in New Jersey from February 28 to March 2, 2007, it is possible that he drove to Maryland or changed his flights after the bookings were made. Third, it is possible that Geib and Gardner are confused about the dates of the alleged conversations with Russ and have the sequence of events incorrect. Geib and Gardner both testified that Geib gave Lawrence's resume to Russ and Russ made a discriminatory comment about Lawrence with respect to the supervisor position; Russ testified

---

[27] Geib and Gardner's accounts differ, as Geib testified that when he gave Lawrence's resume to Russ in February 2007, (Ex. 61, Geib Depo. at 80:22–25), there was no one else present, (*id.* at 61:25–63:7).
[28] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

that this never happened, and could not have happened based on Russ's travel to New Jersey. Therefore, whether Geib gave Lawrence's resume to Russ, whether Stacharowski and Russ actually considered Lawrence for the position, and whether Russ made discriminatory statements are questions of fact for the jury.[29] *Hodges v. Fed.-Mogul Corp.*, 621 F. App'x at 742 ("Rather, the inconsistencies and possible errors in Hodges's testimony should be considered and resolved by a jury.").

It also appears that there is a dispute as to whether Russ was principally responsible for the decision not to promote Lawrence. Viewing the evidence in the light most favorable to the EEOC, Geib testified that he spoke to Stacharowski about Lawrence's application, who then said to speak to Russ. (Ex. 61, Geib Depo. at 40:5–8). This is evidence that Russ was principally responsible for the decision not to promote Lawrence, and therefore, this is an issue for the jury to decide.

Finally, there is a genuine dispute as to whether Lawrence was qualified for the position. PFG's policy indicates that exceptions to the six month continuous service requirement may be made, Geib testified that he requested such an exception, and the alleged discriminatory statements indicate that the exception may not have been given because of Lawrence's sex. Further, it appears that Quinteros, who was ultimately hired, may not have met the minimum requirements of warehouse experience. Therefore, whether Lawrence was qualified for the position in spite of not being at PFG for six months prior, and whether PFG refused to grant an exception because of Lawrence's sex, are questions for the jury.

### III.     Motion for Leave to File a Surreply

---

[29] Because there exists a genuine dispute of material fact precluding summary judgment as to whether Lawrence applied for and was considered for the training supervisor position, the court will not address the EEOC's alternative argument that application would have been futile. (ECF 236, EEOC's Mot. for Summary Judgment at 111–12).

The EEOC moved for leave to file a surreply regarding applicant dates it included in its briefing that PFG claimed in its reply were "falsified." (ECF 297). PFG filed an opposition. The parties apparently stipulated that for applicants whose application dates were missing, the parties would assume that they applied 60 days prior to the date of hire. PFG alleges that the EEOC inserted stipulated dates, though, for applicants whose actual application dates were known. The dispute about the dates mostly relates to the individual cases of the 40 designated class members, since it is relevant to the issue of comparators. Although surreplies are disfavored, the EEOC's surreply relates to a discrete issue which PFG has already responded to in its opposition. Therefore, the court will grant EEOC's motion for leave.

## CONCLUSION

For the reasons stated above, the court will deny EEOC's motion for summary judgment and PFG's cross motion for summary judgment, and grant the EEOC's motion for leave to file a surreply. A separate order follows.


| 3/18/20 | /s/ |
|---------|-----|
| Date | Catherine C. Blake |
| | United States District Judge |